IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN H. MACSHERRY, JR.,
    *Plaintiff*,

    v.                     Civil Action No. ELH-15-22

SPARROWS POINT, LLC, et al.
    *Defendants*.

## MEMORANDUM OPINION

John Macsherry, Jr., plaintiff, filed suit against defendants Sparrows Point, LLC ("SPLLC"); Commercial Development Company, Inc. ("CDC"); and Michael Roberts ("Roberts"), to recover a commission of $825,000 allegedly owed to him in connection with the sale of commercial property for $110,000,000. *See* ECF 2.[1] In his Amended Complaint (ECF 26), plaintiff seeks relief from all defendants under the Maryland Wage Payment and Collection Law ("MWPCL"), Maryland Code (2016 Repl. Vol.), §§ 3-501 *et seq.* of the Labor and Employment Article ("L.E."). As to SPLLC and CDC, he also asserts claims for breach of contract (Count II); promissory estoppel/detrimental reliance (Count III); and quantum meruit/unjust enrichment (Count IV). *See* ECF 26.[2]

---

[1] Plaintiff filed suit in the Circuit Court for Baltimore County. ECF 2. Defendants removed the case based on diversity of citizenship. *See* 28 U.S.C. §§ 1332 and 1441. ECF 1. Thereafter, defendants moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 9. By Order of May 21, 2015 (ECF 19), I granted the motion with respect to the claims against Roberts individually, but denied the motion as to the claims against SPLLC and CDC. In particular, I noted that Macsherry had failed to allege that Roberts was his employer. *Id.* However, I granted Macsherry leave to amend his Complaint. *Id.* Macsherry filed an Amended Complaint on July 7, 2015. ECF 26.

[2] Roberts moved to dismiss the Amended Complaint, for failure to state a claim. ECF 29. By Memorandum Opinion (ECF 38) and Order (ECF 39) of October 23, 2015, I denied the motion as to Count I, which asserts a claim against Roberts under the MWPCL. *See* ECF 39. But, I dismissed counts II-IV as to Roberts. *See id.*

Defendants have moved for summary judgment (ECF 59), supported by a memorandum of law (ECF 59-1) (collectively, "Motion") and many exhibits.  *See* ECF 59-3 through ECF 59-19.  Macsherry has filed a combined opposition and cross-motion for partial summary judgment (ECF 64), which is supported by a memorandum of law (ECF 64-1) (collectively, "Cross Motion") and numerous exhibits.  *See* ECF 64-3 through ECF 64-20.  In his Cross Motion, Macsherry seeks summary judgment only as to his claim that Roberts was an "employer" as defined by the MWPCL.  *See* ECF 64.  In a combined reply, defendants responded to Macsherry's opposition and opposed his Cross Motion (ECF 67), with exhibits.  *See* ECF 67-2 through ECF 67-5.  Macsherry replied (ECF 70), supported by two exhibits.  ECF 70-1; ECF 70-2.

The Motion and the Cross Motion are fully briefed and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny both motions.

### Table of Contents

I.    Factual Background ............................................................................................................... 3

II.   Standard of Review ............................................................................................................. 15

III.  Choice of Law ..................................................................................................................... 17

   A.   Count I ............................................................................................................................ 18

   B.   Counts II-IV .................................................................................................................... 19

     1.   Maryland Law – First Restatement Approach............................................................. 19

     2.   Missouri Law – Second Restatement Approach.......................................................... 23

     3.   Maryland Law – *Renvoi* ............................................................................................. 30

---

Plaintiff subsequently moved for leave to amend to add claims for fraud and/or fraudulent conveyance against Roberts and SPLLC, and to add three new defendants.  *See* ECF 47.  By Memorandum Opinion (ECF 55) and Order (ECF 56) of October 28, 2016, I denied plaintiff's motion.  In particular, I observed that the motion was filed five months after the deadline in the Scheduling Order for amendments.  ECF 55 at 15.  Moreover, given the substantial progress that had been made in the case, I concluded that the expense and delay that would result from the assertion of new claims and the addition of new parties would have been unduly prejudicial to defendants.  *Id.* at 21.

IV.  Discussion ............................................................................................................. 33

   A.  Breach of Contract (Count II) ........................................................................... 33

     1.  Maryland Contract Law ............................................................................. 33

     2.  Analysis ..................................................................................................... 40

     3.  Statute of Frauds ....................................................................................... 46

   B.  Promissory Estoppel (Count III) ....................................................................... 48

   C.  Quantum Meruit (Count IV) .............................................................................. 51

     1.  Unjust Enrichment .................................................................................... 53

     2.  Implied-in-Fact Contract .......................................................................... 56

   D.  MWPCL ............................................................................................................. 58

     1.  Defendants' Motion – MWPCL Claim ..................................................... 61

     2.  Defendants' Motion – *Bona Fide* Dispute ................................................. 62

     3.  Plaintiff's Cross-Motion ........................................................................... 64

V.  Conclusion .............................................................................................................. 72

## I.    Factual Background

CDC is a real estate acquisition and development firm with its headquarters in St. Louis, Missouri.  ECF 59-3 (Roberts Affidavit), ¶ 3.  CDC and an affiliate company, Environmental Liability Transfer, Inc. ("ELT"), "specialize in acquiring, remediating, and repositioning environmentally challenged brownfield sites."  *Id.* ¶ 4.[3]  SPLLC was formed as a single purpose Missouri limited liability company to "acquire 3,100 acres of real property located at the Sparrows Point peninsula in Baltimore County, formerly the site of the industrial complex owned by Bethlehem Steel . . . ."  *Id.* ¶ 6 (the "Property").  Roberts and his brother, Tom Roberts ("T.

---

[3]  ELT is a Missouri Corporation.  *See* Missouri Secretary of State, 2017 Annual Registration Report, "Environmental Liability Transfer, Inc.", *available at*: https://go.usa.gov/xRUWp.

The parties did not define "brownfield" in their submissions.  According to the Oxford English Dictionary, "brownfield" means "to designate an (urban) area, which is or has formerly been the site of commercial or industrial activity, *esp.* one now cleared and available for redevelopment."  OXFORD ENGLISH DICTIONARY ONLINE, Oxford University Press, "Brownfield" (*last accessed* July 14, 2017).

Roberts"), are the co-owners, co-managers, and authorized representatives of CDC, ELT, and SPLLC. *Id.* ¶ 7.

Macsherry resides in Maryland.  ECF 64-3 (Macsherry Affidavit), ¶ 2.[4]  He became a licensed real estate "associate broker" in 1983.  ECF 59-6 (Macsherry Deposition) at 17.[5]  In 2012, he was "laid off" as the head of Duke Realty's Baltimore office, which closed that year. ECF 59-6 at 37-38.  Macsherry subsequently did "some consulting" for KLNB, another commercial real estate firm.  *Id.* at 39.  In particular, he worked on a project for Lafarge concerning Lafarge's lease at Sparrows Point.  *Id.*

Around 2012, Dan Gundersen, the Director of Economic Development for Baltimore County, approached Macsherry about serving on the County's "Sparrows Point Partnership" ("Partnership").  ECF 64-4 (Macsherry Deposition) at 44-45.  The Partnership was a task force established by Baltimore County Executive Kevin Kamenetz to "look at what potentials could be at Sparrows Point and try to come up with a proactive approach of . . . what could happen with the property from an economic development perspective."  *Id.* at 44.  Kamenetz subsequently appointed Macsherry to the Partnership.  *Id.* at 45.

In September 2012, SPLLC and entities formed by "Hilco Global" purchased the Property out of the bankruptcy of "RG Steel."  ECF 59-3, ¶ 8.  Roberts avers, *id.*: "SPLLC acquired the real estate and assumed certain environmental liabilities, while Hilco generally acquired title to all improvements, including buildings, equipment, fixtures, and raw materials." Roberts maintains that he took primary responsibility for CDC's work on the Property.  *Id.* ¶ 10.

---

[4] Macsherry does not specify his place of domicile in his Amended Complaint (ECF 26, ¶ 2) or in his Affidavit.  ECF 64-3, ¶ 2.

[5] Citations to page numbers for deposition transcripts refer to the page number of the transcript, not to the CM/ECF page number.

T. Roberts testified at his deposition that the Property was the largest single parcel that CDC had ever acquired, by a factor of five.  ECF 64-8 (T. Roberts Deposition) at 46.

As indicated, the Property was the site of the industrial complex previously owned by Bethlehem Steel.  ECF 59-3, ¶ 6; ECF 64-4 (Macsherry Deposition) at 41.  The Property consists of 3,100 acres and includes buildings, equipment relating to the manufacture of steel, plants still containing equipment, administration buildings, security buildings, rail, and a port.  ECF 64-4 at 41-43.

Shortly after SPLLC acquired the Property, Roberts authorized CDC's Vice President of Asset Management, Robert Schoelch, "to search for a 'boots on the ground' employee to represent SPLLC's interest locally", because of the Property's "size and political dynamics . . . and the distance between Baltimore and St. Louis."  ECF 59-3 (Roberts Affidavit), ¶¶ 6, 12; *see also* ECF 59-5 (Roberts Deposition) at 85-86 (explaining that Schoelch had recommended that Roberts hire "a local at the site to field calls and to work with the different community people, [and] regulators").  Roberts authorized Schoelch to "interview potential employees, discuss potential terms", and then report back.  ECF 59-3, ¶ 14.  But, Roberts asserts: "[N]o person other than me had the authority to hire an employee for the 'boots on the ground' position, or to approve that employee's terms of employment."  ECF 59-3, ¶ 14.

During the same time frame, Macsherry learned of the acquisition of the Property and asked Gundersen for the name of a contact concerning the Property.  ECF 59-6 at 45-46.  Gundersen provided the name of Randall Jostes, the president of ELT.  *Id.* at 46.  Macsherry emailed Jostes on September 20, 2012, to discuss working for ELT and CDC as "the hands on local person . . . in Baltimore."  ECF 59-7 (email to Jostes); *see also* ECF 59-6 at 46-48.  Macsherry also stated, ECF 59-7: "I am a Baltimore person who has been in the real estate

industry for close to 30 years. I have excellent experience in master planning, development, Brownfield experience (can't say I am an expert) and have excellent contacts in the community. My background is very broad with hands on experience." Macsherry added, *id*.: "My knowledge of the Port, Sparrows Point, environmental matters, master planning, land development, building development and the relationships I have both in the government and business community should be of value to your company."

Upon Jostes's receipt of Macsherry's email on September 20, 2012, Jostes forwarded it to Roberts, T. Roberts, Schoelch, and Mark Hinds. ECF 59-7.[6]  Jostes stated that Macsherry "may be a good resource to consider for ongoing efforts at Sparrow.  I'll leave it to Rob and Mark to get back to this person or let it go." *Id.*

During October, November, and December 2012, Macsherry interviewed with representatives of CDC and SPLLC, including "informal meetings, dinners, lunches, and telephone calls . . . ." ECF 59-8 (Macsherry Answers to First Set of Interrogatories), Answer to Interrogatory No. 1, at 4.  The individuals with whom he met included Roberts, T. Roberts, Schoelch, Hinds, and Becky Lydon, CDC's chief operating officer. *Id.* at 4-5.

Macsherry claims that on November 5, 2012, Schoelch conducted a telephone interview with Macsherry.  Plaintiff informed Schoelch that he was seeking a job "to market Sparrows Point and to redevelop it."   ECF 59-6 at 56.  Thereafter, he and Schoelch had several other telephone conversations, some of which included Roberts. *Id.* at 57.  Macsherry and Schoelch also had dinner at a restaurant in Baltimore on November 13, 2012. *Id.* at 58.  According to Macsherry, they "discussed Sparrows Point . . . , what was going on there, what the challenges were, what they were looking for, whether they needed somebody to be a point person that's on

---

[6] Defendants have not identified Mr. Hinds's position.  Macsherry testified that he did not know Hinds's title at CDC.  ECF 59-6 at 95.

the street . . . or whether they were going to try and do it themselves." ECF 59-6 at 65-66. Macsherry also spoke about his background. *Id.* at 66. The issue of compensation was not discussed, however. *Id.* at 69.[7]

Macsherry claims that he followed up with representatives of CDC and/or SPLLC several times by telephone. *Id.* at 71. At his deposition, Macsherry testified that at some point before December 4, 2012, he had a conversation with Schoelch, and Schoelch stated that he would send Macsherry "an outline of business terms." *Id.* at 76. Schoelch then sent Macsherry a term sheet as to Macsherry's employment. *See* ECF 59-10 ("First Term Sheet"). Macsherry testified that Schoelch told him that "Mike Roberts had signed off on all of these [terms]." *Id.* at 76-77.

The First Term Sheet listed the "Position" as "Vice President of Leasing and Development-Sparrows LLC," with a start date "TBD." *See* ECF 59-10. Macsherry's duties were set forth as follows, *id.*:

> Be directly responsible for the marketing and brokerage efforts for the property; work directly with listing broker and general counsel to negotiate lease and sale contracts. Work with community organizations to increase the awareness of property; be point person to identify international customers and port related users for the site.
>
> Be responsible for identifying appropriate local and state economic development packages/incentives; understanding the appropriate brown field entitlements and subsidies; work with Site Manager to address master plan issues including utility services, rail issues, zoning/subdivision issues, RET appeals, etc.

In addition, the First Term Sheet specified a salary of "$50,000 per year." *Id.* And, of relevance here, the First Term Sheet addressed "Commission" as follows: "75 basis points paid on the total net value of any sales/leases or parcels." *Id.* As examples, the First Term Sheet listed: "100 acres sold @ $200,000 per acre = $150,000" and "100 acres leased for 5 yrs @

---

[7] At his deposition, Macsherry indicated that he had dinner with Schoelch in Baltimore "at a couple of different places." *Id.* at 66. But, the deposition excerpts provided to the Court do not shed light on other dinners.

$1,200 per acre/month = $54,000." *Id.* The First Term Sheet also addressed health benefits, vacation, and paid holidays. *See id.*

At his deposition, Schoelch testified that he had created the First Term Sheet and that the purpose of it was "[t]o identify the terms of employment for John Macsherry." ECF 64-7 at 47. Notably, Schoelch also stated that he had discussed the terms set forth in the First Term Sheet with Roberts, and that Roberts had approved them. *Id.* at 47-48.

After Macsherry received the First Term Sheet, he "responded to [Schoelch] and talked about the project, how detailed it was, how complicated it was, how much time and effort was going to be needed in moving this property forward." ECF 59-6 at 77. Macsherry testified that he asked Schoelch, among other things, for a salary of $100,000 and a commission greater than 75 basis points. *Id.* Schoelch responded that he had "to get Mike's approval." *Id.* at 80.

Schoelch emailed Macsherry a revised term sheet on December 4, 2012, which was a redlined copy of the First Term Sheet. *Id.* at 81-82; *see* ECF 59-11 ("Second Term Sheet"). Schoelch testified that he made the revisions that appear on the Second Term Sheet. ECF 64-7 at 50-51. Moreover, Schoelch testified that he would have verbally communicated to Roberts the terms of the Second Term Sheet. *Id.* at 55-56.

Among other things, the Second Term Sheet provided a start date of "Monday, December 10, 2012." ECF 59-11. It also reflected an increase in Macsherry's proposed salary, from $50,000 per year to $77,000 per year. *Id.* Although the Second Term Sheet did not change the "Commission" amount from "75 basis points paid on the total value of any sales/leases on parcels", it added the qualification that the commission would only be paid "on any deals closed after the Start Date. Lafarge and Fritz deals excluded." *Id.*

Macsherry testified that during a telephone conversation with Schoelch on December 4, 2012, Schoelch extended "an offer of employment" to Macsherry. ECF 59-6 at 73. Schoelch and Macsherry discussed "all aspects of the compensation package", including Macsherry's start date, salary, and bonus. *Id.* Notably, Macsherry testified that Schoelch informed him that Roberts had approved the Second Term Sheet. *Id.* at 84-85. Although Macsherry made some requests for changes, Macsherry claims that Schoelch said: "[T]his is the deal, that Mike's going to do, and you got to make a decision." *Id.* at 82.

Later on December 4, 2012, Macsherry called Schoelch to accept the offer. *Id.* at 85. At that point, Schoelch told Macsherry that he needed to meet with Roberts and T. Roberts in St. Louis. *Id.* at 86. Notably, when Macsherry was asked at his deposition whether he understood that he had been hired at that point, Macsherry responded: "No." *Id.* Macsherry testified that he understood the meeting with Roberts and T. Roberts to be an interview, and that his employment was subject to their approval. *Id.*

On or about December 7, 2012, Macsherry flew to St. Louis for an interview with Roberts and T. Roberts. *Id.* at 91. After meeting with the Roberts brothers and other CDC employees, Macsherry was instructed to meet with Lydon, who informed Macsherry that he was hired. *Id.* at 91-95. Lydon also asked Macsherry to sign various documents, including an employment agreement. *Id.* Macsherry claims that he examined the document "very carefully," comparing the text of the employment agreement with the terms in the Second Term Sheet. *Id.* at 98. According to Macsherry, the terms of the employment agreement were identical to the provisions of the Second Term Sheet. *Id.* at 96-98. He also stated that he asked Lydon: "Is this the one that Rob and I agreed to?", and Lydon responded, "Yes." *Id.* at 99. Macsherry claims that he signed the employment agreement. *Id.* at 97.

According to Macsherry, after he signed the employment agreement, Lydon said that "she would have Mike Roberts sign it" and would send Macsherry a copy. *Id.* at 100. But, Macsherry states that he never received a copy of the signed employment agreement. ECF 59-13, Nos. 7, 8; *see also* ECF 59-6 at 100. Nor was Macsherry ever informed that Roberts had signed the employment agreement. ECF 59-13, Nos. 1, 2. And, the record does not contain a signed employment agreement. However, the handwritten word "Accepted" appears on the Second Term Sheet, along with Macsherry's signature. *See* ECF 59-11. Macsherry testified at his deposition that he signed that document in "Mid-2013". ECF 59-6 at 103.

Consistent with the Second Term Sheet, Macsherry began working for SPLLC and/or CDC at the Property on December 10, 2012. ECF 59-6 at 91; ECF 64-4 at 120. He claims to have performed a variety of duties, including meeting with representatives of a potential buyer of the Property, "Beowulf Energy LLC" (ECF 64-4 at 197-98); keeping the North Point Community Association "up to speed on what was going on at the site" and discussing their concerns (*id.* at 195-96); and coordinating the renewal of the lease of a tenant, Nelson Pallet. *Id.* at 160. As discussed, *infra*, Macsherry also claims that he was involved in the ultimate sale of the Property. *Id.* at 154.

Macsherry sent Lydon an email on June 4, 2013, requesting a copy of the employment agreement that he claims to have signed in December 2012. *See* ECF 59-14 at 3-4. Lydon did not dispute the existence of such a document. Rather, she replied, *id.* at 3: "Let me see if I can locate it–I never got a copy of it." The next day, June 5, 2013, Macsherry asked Lydon if she had been able to find the executed employment agreement. *Id.* On June 6, 2013, Lydon replied: "John, I apologize as I am and have been in the middle of a big closing. Please give me a check back tomorrow . . . ." *Id.* at 2. On the same date, Macsherry sent Lydon another email,

informing her that he "found the agreement", although Lydon had "the signed on [sic]." *Id.* He also stated that he had asked Schoelch for a copy of the executed agreement, but Schoelch was unable to find it. *Id.*; *see also* ECF 59-15 (June 5, 2013 email to Schoelch).[8]

On July 16, 2013, after the Nelson Pallet deal was finalized, Macsherry sent Schoelch an email asking if his commission for that deal had been submitted. ECF 59-16. Schoelch replied the same day, stating, *id.*: "On the Nelson thing I was waiting for you to send me a signed copy of your employment agreement. If you recall, I can not [sic] find one." On July 18, 2013, Macsherry sent Schoelch an email, along with a copy of the Second Term Sheet. *See* ECF 59-17; *see also* ECF 59-6 at 103. At his deposition, Schoelch testified that he told Macsherry that the copy of the Second Term Sheet "was not his term sheet." ECF 59-9 at 146.

Macsherry testified that during a subsequent conversation with Schoelch regarding the Nelson Pallet commission, Schoelch told Macsherry: "Look, right now is not a good time. Mike Roberts has a lot on his plate. Let's not do this right now. Let's – let's do this later." ECF 64-4 at 183. Macsherry testified that he never asked Roberts about his commission for the Nelson Pallet deal. ECF 59-6 at 184. Nor was he paid a commission. *Id.* at 182. But, the commission Macsherry claimed was due to him for the Nelson Pallet deal was only $168.75 or $281.25. *See* ECF 64-13 (Macsherry Commission Invoice); ECF 64-14 (Macsherry Commission Invoice).

According to Roberts, in December 2013, SPLLC and Hilco entered into a "Purchase and Sale [A]greement" for the Property. ECF 59-3, ¶ 19. Roberts avers that over the two year period during which SPLLC and Hilco jointly owned the Property, the two entities were "in regular communication." *Id.* ¶ 17. Roberts claims that serious negotiations "began between Tom

---

[8] It seems that Macsherry actually found the Second Term Sheet. *See* ECF 59-6 at 103 (explaining that Macsherry had signed the Second Term Sheet in mid-2013, and neither Lydon nor Schoelch could find the executed copy of Macsherry's employment agreement).

Roberts, [Roberts], and principals of Hilco, and continued intermittently between Rob Schoelch of CDC, Randall Jostes of ELT, and principals of Hilco." *Id.* ¶ 18.  The transaction closed on September 17, 2014.  *Id.* ¶ 19.  The Baltimore Sun reported that Hilco paid $110 million for the Property.  Natalie Sherman, *Sparrows Point Buyers Pay $110 Million*, Baltimore Sun, Oct. 27, 2014, *available at*: http://bsun.md/2spX0Tl.

Macsherry's role in the sale of the Property is disputed.  In his Affidavit, Roberts asserted that the agreement between Hilco and SPLLC in December 2013 happened "completely independent of Macsherry's actions . . . ."  ECF 59-3, ¶ 19.  Moreover, Roberts stated, *id.* ¶ 20: "Mr. Macsherry did not procure Hilco or its eventual partner, Redwood Capital, as prospective purchasers of the Sparrows Point property, nor did Mr. Macsherry serve any material or significant role in the negotiations with Hilco or Redwood Capital."

In contrast, Macsherry testified at his deposition that he was involved in the negotiations between Hilco and SPLLC.  *See* ECF 59-6 at 245-47.  In particular, Macsherry stated that he was part of the discussions between Schoelch and "Roberto Perez", a vice president of Hilco, over a "protracted period of time . . . ."  *Id.* at 245.  When Macsherry was asked the extent of his participation in the sale of the Property, Macsherry responded that he was involved in "a lot of the conversations" between Schoelch and Perez.  *Id.* at 247.  The following deposition testimony of Macsherry is relevant, ECF 64-4 at 154:

Q:  Now, did you work on the ultimate sale of the Sparrows Point property?

A:  Yes.

Q:  What did you do?

A:  I worked with the buyer, communicated with the buyer on several issues, communicated with CDC on a variety of issues.

Q:  What types of issues?

> A: Marketing, interested parties, County Government, State Economic Development issues, bridge issues. To several different things.

On September 9, 2014, shortly before the closing on the sale of the Property, Macsherry sent Lydon an email stating, ECF 59-18: "Becky, here is the outline of the employment agreement with CDC a reed [sic] to by all parties. Please let me know if you have any questions."[9] Thereafter, on or about September 19, 2014, Macsherry attempted to call Roberts. *See* ECF 59-19 (Sept. 19, 2014 email from Macsherry to Roberts). Macsherry followed up his calls with an email on September 19, 2014, stating, *id.*: "Mike left you a couple of VM's. Can you call me."

Macsherry spoke with Roberts on the morning of September 25, 2014. ECF 64-4 at 234. After this conversation, Macsherry sent Roberts an email (*see* ECF 64-20), along with the copy of the Second Term Sheet that he had signed in 2013. *See id.* Macsherry and Roberts then spoke a second time on September 25, 2014. ECF 64-4 at 236. During the second conversation, Macsherry claims that Roberts said, *id.* at 235: "I know we owe you a commission, but we want to negotiate it. What will you take[?]"

Macsherry was never paid a commission for the sale of the Property. Roberts asserted in his Affidavit of December 14, 2016, ECF 59-3, ¶ 16: "I never agreed to pay Plaintiff, John H. Macsherry, any commission of any kind."

Macsherry testified that he believed that he would receive a commission whether or not he was involved in a transaction for the lease or sale of the Property. ECF 64-4 at 149-50. According to Macsherry, during the interview process, he "had a conversation with Rob

---

[9] It appears that a document titled "Position Vice President of Leasing and Development-4.doc" was attached to the email, but a copy of that document was not included in the exhibit. *See* ECF 59-18 at 2.

[Schoelch], and he said, any . . . transaction, any sale or lease of parcels, or any deals closed after the date, I was going to receive what they call here the – the commission." *Id.* at 152. But, when plaintiff was asked whether Schoelch ever told him that he would receive a commission, regardless of his involvement in the transaction, Macsherry responded, *id.*: "No . . . ." Moreover, when plaintiff was asked whether he "discussed with anyone whether [he] needed to be involved in closing the transaction to earn what is called a commission under this agreement," Macsherry responded: "No." *Id.* at 153.

With respect to Macsherry's understanding of the commission, the following deposition testimony of Macsherry is pertinent, ECF 59-6 at 25:

Q: What was the purpose of the commission in your employment agreement?

A: It was to compensate me for all my duties working on the property.

Q: Was it to provide any extra incentive for you to go out and close deals?

MR. O'CONNELL [Counsel for Plaintiff]:  Objection.

A: It was provided as a – a – you know, a – as they did deals, they could – they could pay me, and so it was to compensate for the low salary.

Q: Okay.  So then you would say it was not designed to give you an incentive to go out and close deals or find transactions?

MR. O'CONNELL:  Objection.  That's not his testimony.

A: I mean, it – it probably could be construed that way, you know, you go out and work hard you could get – you know, you could get a transaction done, you could get more – make more money.  But it's also just that, you know, this is how we're going to pay you as the deals get done, you'll be compensated that way.

Q: And you're saying the sole reason for the way it was designed that way was to compensate you for a low salary?

MR. O'CONNELL:  Objection.

A:  Well, yes, that's the way – that's how they justified the low salary, was that, look, you – you can more [sic] money by doing this deal – doing deals.

Schoelch's deposition testimony is also relevant.  He stated, ECF 64-7 at 58:

The term – it was important in the terms of employment for the guy on the ground that he have a commission component to his compensation because we had a lot of land to move.  So what is meant by this is that that was one part of the compensation, was he would be paid as land was sold.

In addition, the following deposition testimony of Schoelch is pertinent, *id.* at 58-59:

Q:  Did you discuss [the commission] component with Mike Roberts?

A:  I don't recall the 75 basis points.  I do recall a commission/base salary component to the compensation.

Q:  And you discussed that with Michael Roberts?

A:  Mm-hmm.

Q:  Is that a yes?

A:  Yes.

\* \* \*

Q  . . . Did you discuss this component of the compensation package with Mr. Roberts, Michael Roberts; correct?

A:  Yes.

Additional facts are included in the Discussion.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light

most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322–24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002).

However, to defeat summary judgment, conflicting evidence must give rise to a *genuine* dispute of material fact. *Anderson*, 477 U.S. at 247–48. If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Id.* at 248; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016). Conversely, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

### III.    Choice of Law

In this case, subject matter jurisdiction is founded on diversity of citizenship. *See* 28 U.S.C. § 1332. Macsherry asserts common law contract and quasi contract claims under Maryland law, along with a statutory claim under Maryland law. *See* ECF 26.

-17-

In regard to state law claims under diversity jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought. *See, e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *see also Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); C. Wright & A. Miller, *Fed. Practice and Procedure*, § 3567 ("Wright & Miller"). And, federal courts apply the choice of law rules of the state in which the court sits. *See, e.g.*, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010); *see also Prof'l Massage Training Cent., Inc. v. Accreditation Alliance of Career Schools and Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015).

## A.  Count I

In Count I of the Amended Complaint, Macsherry alleges that defendants violated the MWPCL by failing to pay him a commission on the sale of the Property. ECF 26, ¶¶ 22-26. The parties have not addressed whether Maryland law applies so as to permit a claim under the MWPCL. *See* ECF 59-1; ECF 64-1.

In *Cunningham v. Feinberg*, 441 Md. 310, 107 A.3d 1194 (2015), the Maryland Court of Appeals considered whether an attorney who spent most of his time at an office in Virginia, but handled Maryland cases and conducted business in Maryland, could bring a MWPCL claim in Maryland against his former employer, which was located in Virginia,. *Id.* at 315-317, 107 A.3d at 1198-99. The *Cunningham* Court concluded that the doctrine of *lex loci contractus* does not necessarily apply with respect to the MWPCL because, *inter alia*, the MWPCL "represents strong Maryland public policy." *Id.* at 344, 107 A.3d at 1215. Thus, the court said, *id.* at 337,

107 A.3d at 1210-1211: "[E]mployees working for employers located in Virginia are not limited to the remedies available under Virginia's wage payment laws, but may, in certain circumstances, be answerable to claims under the MWPCL in Maryland courts.[1]"

Here, it is undisputed that Macsherry's duties were performed exclusively, or almost exclusively, in Maryland.  ECF 63-3, ¶ 5.  In light of *Cunningham*, Macsherry may pursue a claim under the MWPCL.  *See also Hausfeld v. Love Funding Corp.*, 443, 455 (D. Md. 2015) ("The fact that an individual works for an out-of-state company, located in that state, under an employment contract governed by the laws of that state, does not preclude the applicability of the MWPCL.").

## B.     Counts II-IV

The parties dispute the substantive law that applies to Count II, Count III, and Count IV. Defendants did not include a choice of law clause in the Second Term Sheet.  And, Macsherry testified that the language of the employment contract that he signed in St. Louis was identical to the language of the Second Term Sheet.  ECF 59-6 at 98-100.  But, in defendants' view, Missouri law applies because Maryland courts would apply the doctrine of *lex loci contractus* to those claims.  ECF 59-1 at 17-19.  Conversely, plaintiff contends that Maryland law applies to each count under either the doctrines of *lex loci contractus* or *renvoi*.  ECF 64-1 at 16-21.

### 1.  Maryland Law – First Restatement Approach

Count II of the Amended Complaint asserts a claim for breach of contract.  ECF 26, ¶¶ 27-32.  Unless the parties to the contract agreed to be bound by the law of another state, "Maryland abides by the common law doctrine of *lex loci contractus*, which applies the law of the jurisdiction where the contract was made 'when determining the construction, validity, enforceability, or interpretation of a contract.'"  *Oliveira v. Sugarman*, 451 Md. 208, 233 n. 17,

152 A.3d 728, 743 n. 17 (2017) (quoting *Cunningham*, 441 Md. at 326, 107 A.3d at 1204);
*accord Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301
(1995).

Maryland courts follow the principles stated in the Restatement (First) of Conflict of
Laws (1934) ("First Restatement").  *See generally Lab. Corp. of Am. v. Hood*, 395 Md. 608, 615,
911 A.2d 841, 845 (2006); *Black v. Leatherwood Motor Coach Corp.*, 92 Md. App. 27, 41, 606
A.2d 295, 301 (1992) ("Because Maryland is among the few states that continue to adhere to the
traditional conflict of laws principle of *lex loci delicti,* the First Restatement of Conflict of Laws,
while of merely historical interest elsewhere, continues to provide guidance for the determination
of *lex loci delicti* questions in Maryland."), *cert. denied*, 327 Md. 626, 612 A.2d 257 (1992).  In
applying *lex loci contractus*, Maryland courts look to the place where "'the last act occurs
necessary under the rules of offer and acceptance to give the contract a binding effect.'" *Cont'l
Cas. Co. v. Kemper Ins. Co.*, 173 Md. App. 542, 548, 920 A.2d 66, 69 (2007) (quoting *Aetna
Cas. & Sur. Co. v. Souras,* 78 Md. App. 71, 77, 552 A.2d 908 (1989)); *accord Union Trust Co.
of N. J. v. Knabe*, 122 Md. 584, 89 A. 1106, 1114 (1914) ("A contract is made where the last act
is done to make it a binding obligation upon the parties to it.").

Count III of the Amended Complaint sets forth a claim for promissory estoppel.  In
general, such claims are "quasi-contractual".  *Ver Brycke v. Ver Brycke*, 379 Md. 669, 693 n.9,
843 A.2d 758, 772 n.9 (2004).  The Maryland Court of Special Appeals has said: "'[T]he nature
of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a
contract.'"  *Maryland Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police, Inc. v.
Maryland Transp. Auth.*, 195 Md. App. 124, 215, 5 A.3d 1174, 1227 (2010) (quoting *Suburban
Hospital, Inc. v. Sampson*, 807 F. Supp. 31, 33 (D. Md. 1992)), *rev'd on other grounds*, 420 Md.

141, 21 A.3d 1098 (2011).  Because an action for promissory estoppel is tantamount to an action to enforce a contract, it is likely that a Maryland court would apply the doctrine of *lex loci contractus*.

Count IV of the Amended Complaint alleges quantum meruit and unjust enrichment. Maryland applies the doctrine of *lex loci contractus* to claims for unjust enrichment.  *See Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 142 Md. App. 476, 490–92, 790 A.2d 720, 728–29 (2002) (stating that "the place the contract was made" determines choice of law for contract disputes and unjust enrichment claims); *see also Richter Cornbrooks Gribble, Inc. v. BBH Design, P.A.*, WDQ-09-1711, 2010 WL 3470055, at *2 (D. Md. Sept. 2, 2010) ("For contract and unjust enrichment claims, Maryland courts follow the rule of *lex loci contractus*, applying the substantive law where the contract was formed.").

In light of the foregoing, I must determine where the last act necessary to form a contract took place.  In my view, the undisputed evidence points to the conclusion that the last act took place in Missouri.

As indicated, on December 4, 2012, Macsherry and Schoelch spoke by telephone regarding the "boots on the ground" job with SPLLC and/or CDC.  ECF 64-4 at 73.  Macsherry was in Maryland during these telephone conversations.  ECF 64-3, ¶ 4.  It is not clear where Schoelch was located, but it is reasonable to assume that he was in St. Louis.  Macsherry testified that Schoelch extended an offer of employment during that call (*id.*), and that Macsherry accepted the "offer" during another telephone call later that day.  *Id.*  However, Macsherry specifically acknowledged that he understood that he had not yet been hired at that point, because the offer required the approval of Roberts, who was in Missouri.  ECF 64-4 at 86.

Macsherry travelled to St. Louis to meet with Roberts and T. Roberts about the job. Then, he met with Lydon, who said "we want to hire you . . . .'" ECF 59-6 at 95. According to Macsherry, Lydon provided him with an employment agreement that included the same terms as those set forth in the Second Term Sheet, and he signed the agreement. ECF 59-6 at 96-97.

Plaintiff contends that because he accepted the offer in Maryland, the last act occurred while he was in Maryland. ECF 64-1 at 16-18. However, Macsherry specifically acknowledged that he understood that he had not yet been hired at that point, because the offer was subject to the approval of Roberts. ECF 64-4 at 86. Therefore, Macsherry traveled to Missouri, where he met with Roberts and was then offered the job. Macsherry's testimony concerning his trip to St. Louis unequivocally establishes that the last act in forming the alleged agreement between the parties occurred in Missouri.[10]

Therefore, a Maryland court applying the doctrine of *lex loci contractus* would look to the law of Missouri. As explained in more detail, *infra*, under certain circumstances present here, in applying the law of a foreign state, Maryland courts apply the *whole law* of that state, including the state's choice of law rules. *Am. Motorists*, 338 Md. at 574, 659 A.2d at 1302. The question, then, is what law Missouri would apply with regard to a contract formed in Missouri but to be performed in Maryland.

---

[10] In effect, the agreement that Macsherry claims to have accepted in Maryland was, by his own account, subject to a condition precedent, *i.e.*, Macsherry conducting a successful interview with Roberts in St. Louis. To my knowledge, Maryland appellate courts have not addressed how or whether a condition precedent affects the "last act" in the context of analysis of choice of law. But, where there is a condition precedent in a contract, the "last act" necessary to give binding effect to the contract appears to occur where the condition precedent is satisfied. *See, e.g.*, *Pro Football Inc. v. Paul*, 39 Va. App. 1, 10, 569 S.E.2d 66, 71 (2002) ("As a condition precedent to [defendant's] employment with the Redskins, the Trade Agreement required Paul to report to Redskins Park, complete the Club's physical and be on Washington's roster during the 1999 season. All of these acts took place in Virginia. Because the last acts necessary to form the contract of employment between Paul and the Redskins occurred in Virginia, the agreement was "made in this Commonwealth' . . . .").

## 2.   Missouri Law – Second Restatement Approach

In contract cases, "Missouri follows the 'most significant relationship' test of the Restatement (Second) of Conflict of Laws, section 188, in determining what law applies." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 58 (Mo. 2005) (en banc); *accord Zafer Chiropractic & Sports Injuries, P.A. v. Hermann*, 501 S.W.3d 545, 551 (Mo. Ct. App. 2016) ("In determining which state's laws should be applied in contract claims, Missouri courts apply the most significant relationship test set forth in Restatement (Second) of Conflict of Laws § 188.").

Section 188 of the Restatement (Second) of Conflict of Laws (1971) ("Second Restatement") provides, *id.*:

> (1)   The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

> (2)   In the absence of an effective choice of law by the parties (*see* § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and
> (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§189- 199 and 203.

In addition, comment e to § 188 is noteworthy.  It provides:  "When both parties are to perform in the state, this state will have so close a relationship to the transaction and the parties

that it will often be the state of the applicable law even with respect to issues that do not relate strictly to performance."   Comment e also provides, *id.*: "When the contract deals with a specific physical thing, such as land or a chattel . . . , the location of the thing or of the risk is significant . . . ."

Section 6 of the Second Restatement provides, *id.*:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Missouri courts also look to section 196 of the Second Restatement, which is titled "Contracts for the Rendition of Services."   *See Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 441 n. 2 (Mo. Ct. App. 1985).   Curiously, neither side has referred to § 196.   *See* ECF 64-1; ECF 67.   Section 196 provides:

The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which the event the local law of the other state will be applied.

Notably, the Missouri Court of Appeals and numerous other state and federal courts have looked to § 196 in the context of employment contracts.   *Ranch Hand Foods*, 690 S.W.2d at 441

n. 2; *see also, e.g.*, *Dinan v. Alpha Networks, Inc.*, 764 F.3d 64, 69 (1st Cir. 2014) (applying § 196 of the Second Restatement to an action for breach of contract and quasi-contract concerning an employment agreement); *Ingram v. Rencor Controls, Inc.*, 256 F. Supp. 2d 12, 17 (D. Me. 2003) (applying § 196 to an employment contract); *McGough v. Nalco Co.*, 496 F. Supp. 2d 729, 743 (N.D. W. Va. 2007) (same); *Nunez v. Hunter Fan Co.*, 920 F. Supp. 716, 719 (S.D. Tex. 1996) (same); *Sullivan v. Oracle Corp.*, 254 P.3d 237, 244 (Cal. 2011) ("Section 196 identifies the state whose law governs the validity of an employment *contract*.") (emphasis in original); Second Restatement § 196, comment a (explaining that § 196 applies "to contracts with servants, independent contractors and agents . . . .").

In sum, in determining the applicable choice of law with respect to an employment contract, Missouri courts determine what state has the most significant relationship to the case, in accordance with § 196 of the Second Restatement, the factors set forth in § 188 of the Second Restatement, and the principles articulated in § 6 of the Second Restatement. *See Accurso v. Amco Ins. Co.*, 295 S.W.3d 548, 553 (Mo. Ct. App. 2009). But, the parties dispute the outcome that a Missouri court would reach in applying the Second Restatement to the facts of this case.

Relying on the factors articulated in § 188, defendants argue that "Macsherry initiated negotiations by reaching out to Defendants, all of whom are Missouri citizens, regarding potential employment." ECF 67 at 8. Defendants also note that "at least some negotiations" took place in Missouri, and that Macsherry traveled to Missouri for the final interview. *Id.* As to the place of performance of the contract, defendants assert that "while Macsherry performed at least some of his employment duties in Maryland, his affidavit does not reveal whether he traveled to other states during the course of his employment." *Id.* And, defendants posit that it is "clear" that the contract was made in Missouri. *Id.*

Defendants also maintain that the balance of factors and § 6 support the application of Missouri law.  They contend: "It would be unfair and violate the expectations of the parties to charge Defendants with the application of Maryland law when it is Macsherry who solicited employment with a Missouri entity, traveled to Missouri to meet with that entity, was hired while in Missouri, and was admittedly employed and paid by SPLLC, a Missouri entity." *Id.*

Macsherry points out, ECF 64-1 at 18:

> The Property is located in Maryland, all of Plaintiff's employment duties were performed in Maryland, Plaintiff is a Maryland resident, Defendants CDC and SPLLC do business in Maryland, including owning the Property in the name of SPLLC, Plaintiff was paid his salary in Maryland and all of the contract negotiations occurred *via* telephone while Plaintiff was in Maryland.

In my view, it is likely that a Missouri court applying § 196 of the Second Restatement would find that Maryland law applies to the claim for breach of contract.  Section 196 applies to contracts for services, including employment contracts.  As indicated, § 196 directs a court to apply "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered . . . ."  Comment b to § 196 advises that the place where services are to be rendered "enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time."

Notably, plaintiff was hired to perform marketing and sales services in Maryland concerning the Property, which consisted of 3100 acres of land located in Maryland.  Roberts authorized Schoelch to hire a "boots on the ground" employee to "represent SPLLC's interests locally" at the Property.  ECF 59-3, ¶¶ 6, 12.  According to Roberts, Schoelch told him that SPLLC "should have a local at the site to field calls and to work with different community people [and] regulators . . . ."  ECF 59-5 at 85-86.

Defendants argue that Macsherry was paid by a Missouri entity. ECF 67 at 8. But, they do not dispute that Macsherry received his pay in Maryland. *Id.*; *see* ECF 64-3, ¶ 6. Although it may be true, as defendants suggest, that Macsherry traveled outside of Maryland in performing his role (*see* ECF 67 at 8), it is undisputed that most of Macsherry's duties were performed in Maryland in connection with the Property. *See, e.g.*, ECF 59-3, ¶ 12; ECF 64-3, ¶ 5. The "Duties" section of the Second Term Sheet outlines Macsherry's responsibilities, as follows, ECF 59-11:

> Be directly responsible for the marketing and brokerage efforts for the property; work directly with listing broker and general counsel to negotiate lease and sale contracts. Work with community organizations to increase the awareness of property; be point person to identify international customers and port related users for the site.
>
> Be responsible for identifying appropriate local and state economic development packages/incentives; understanding the appropriate brown field entitlements and subsidies; work with Site Manager to address master plan issues including utility services, rail issues, zoning/subdivision issues, RET appeals, etc.

In regard to the quasi-contract claims, the Court of Appeals for the First Circuit observed in *Dinan*, 764 F.3d at 70, that § 196 refers to contracts, but makes no mention of quasi-contracts. *Id.* Nevertheless, the *Dinan* Court determined that a Maine court would likely apply § 196 to quasi-contractual claims because Maine law recognizes that such claims involve recovery for services provided under an "implied contract" and that "the logic underlying section 196 supports the application of the same principles to quasi-contract" claims. *Id.* (citing *Paffhausen v. Balano*, 708 A.2d 269, 271 (Me. 1998)).

Missouri courts have recognized that a plaintiff pursuing a claim for quantum meruit and unjust enrichment is seeking recovery for services provided under an "implied contract." *See, e.g.*, *Fulton Nat. Bank v. Callaway Mem'l Hosp.*, 465 S.W.2d 549, 553 (Mo. 1971); *Septagon Constr. Co. Inc.-Columbia v. Indus. Dev. Auth. of City of Moberly*, ___ S.W.3d ___, 2017 WL

892550, at *8 (Mo. Ct. App. Mar. 7, 2017); *S & P Properties, Inc. v. City of Univ. City*, 178 S.W.3d 579, 584 (Mo. Ct. App. 2005).   Although the Court has not uncovered a reported decision of a Missouri appellate court with respect to the application of § 196 to promissory estoppel, the Supreme Court of Missouri has noted that, to prove promissory estoppel, "the promise must be made in a *contractual* sense."   *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. 2007) (en banc) (citing *Zipper v. Health Midwest*, 978 S.W.2d 398, 411 (Mo. App. 1998)) (emphasis added).   Accordingly, the logic underlying § 196 supports the application of § 196 to plaintiff's claims for promissory estoppel and quantum meruit.

Even if a Missouri court would not apply § 196 to one or more of plaintiff's claims in counts II-IV, an analysis of the factors enumerated in § 188 of the Second Restatement yields the same conclusion: Maryland has the most significant relationship to the underlying dispute.   As noted, courts applying § 188 consider a number of factors in determining which state has the most significant relationship to a contract dispute.   They are: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; and (e) the domicile, residence, nationality, place of incorporation, and place of business of the parties.

As indicated, the place of performance strongly points towards the application of Maryland law.   It is also noteworthy that the subject matter of the alleged contract is 3,100 acres of real property located in Maryland.   This, too, supports the application of Maryland law.

With respect to the place of negotiation of the contract, this factor is neutral, because the undisputed facts reveal that negotiations took place both in Maryland and in Missouri.   In particular, Schoelch met Macsherry in Baltimore for dinner on at least one occasion (*see* ECF 59-6 at 66), but Macsherry flew to St. Louis for the final interview.   And, although Macsherry

was located in Maryland when he negotiated with Schoelch by telephone and through email (*see* ECF 64-3, ¶ 4), it appears that Schoelch and Roberts were at the CDC offices in Missouri during some or all of those calls.

As to the factor concerning the residency and place of business of the parties, the factor is also neutral.  Macsherry is a resident of Maryland. ECF 64-3, ¶ 2.  However, Roberts is a resident of Missouri (ECF 2, ¶ 5) and SPLLC is a single purpose Missouri limited liability company.  ECF 59-3, ¶ 6.  Moreover, to the extent CDC was involved in forming the contract, CDC is a Missouri Corporation with its headquarters in Missouri.  *Id.* ¶ 3; *see* Missouri Secretary of State, 2017 Annual Registration Report, "Commercial Development Company, Inc.", *available at*: https://go.usa.gov/xNX8y.  Because there is no common domicile of the parties, this factor does not favor either the application of Missouri law or Maryland law.

Finally, the place of contracting favors the application of Missouri law.  As discussed, *supra*, to the extent that a valid contract was formed by the parties, the contract formation would have occurred in St. Louis, when Macsherry allegedly signed the employment agreement provided by Lydon.  *See*  ECF 59-6 at 95-98.  And, even if there is no valid contract, the last act pertinent to forming an agreement occurred at or about the same time.

In sum, it is apparent that Missouri and Maryland both have an interest in the application of their law to this case.  But, on balance, the fact that Macsherry was to perform his duties in Maryland with respect to defendants' Property, located in Maryland, favors the application of Maryland law.  In my view, Maryland has the most significant relationship to the dispute.

Finally, I consider whether my conclusion with respect to §§ 188 and 196 of the Second Restatement is contrary to the conflict of laws principles set forth in § 6 of the Second Restatement.  As noted, § 6 directs courts to consider a variety of factors, including: (a) the needs

of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied.

The only disputed factor in § 6 is the one concerning reasonable expectation of the parties. Comment g to § 6 explains, with respect to the protection of justified expectations, that "it would be unfair and improper to hold a person liable under the local law of one state when he had justifiably molded his conduct to conform to the requirements of another state." Defendants maintain that it "would be unfair and violate the expectations of the parties to charge Defendants with the application of Maryland law . . . ." ECF 67 at 8. But, they do not argue that they conformed their conduct to comply with Missouri law, expecting that Missouri law would apply. Rather, they point to several factors that, in their view, justify their expectation that Missouri law would apply. *See* ECF 67 at 8. And, as discussed, there are numerous factors that give rise to the reasonable expectation that *Maryland* law would apply.

I conclude that a Missouri Court would likely determine that Maryland law applies to Count II, Count III, and Count IV of the Amended Complaint. In my view, § 6 does not counsel against the conclusion that, under §§ 188 and 196, a Missouri court would apply Maryland law.

### 3. Maryland Law – *Renvoi*

Having determined that a Maryland court would likely apply Missouri law as to counts II through IV, and that, in turn, a Missouri court would likely apply Maryland law to those counts, I turn to Maryland's application of the doctrine of *renvoi*. The doctrine of *renvoi* provides that "when the forum court's choice-of-law rules would apply the substantive law of a foreign

-30-

jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules." *Am. Motorists*, 338 Md. at 574, 659 A.2d at 1302 (citation omitted).

Plaintiff argues that defendants ignore the "litany of facts that makes Maryland law the appropriate law to apply in this case under Maryland's well-established conflict of law doctrine of *renvoi*." ECF 64-18 at 18.   Defendants argue that *renvoi* is inapplicable because, in their view, a Missouri Court would most likely apply the substantive law of Missouri.  ECF 67 at 6.

Ordinarily, a state applying the First Restatement would not apply *renvoi* to look to a foreign state's choice of law rules, except in two situations not applicable here.  *See* First Restatement, § 7 ("[W]hen there is a difference in the Conflict of Laws of two states whose laws are involved in a problem, the rule of Conflict of Laws of the forum is applied . . . .")[11]; *see also Polglase v. Greyhound Lines, Inc.*, 401 F. Supp. 335, 337 (D. Md. 1975) ("Section 7 of the Restatement of Conflict of Laws rejects application of the renvoi except for two situations listed in Section 8. No reason is perceived why there should be any exceptions. Almost all writers oppose application of the renvoi.").  The Maryland Court of Appeals adopted a limited version of the doctrine of *renvoi* in a scholarly opinion written in 1995 by the late Judge Howard Chasanow.  *Id.* at 560, 659 A.2d 1295.

In adopting *renvoi*, the Maryland Court of Appeals recognized there can be situations in which Maryland's choice of law rules would point to the application of a foreign jurisdiction's substantive law, and the foreign jurisdiction's choice of law rules would point back to the

---

[11] Section 7(b) of the First Restatement says: "[W]here in making the choice of law to govern a certain situation the law of another state is to be applied, since the only Conflict of Laws used in the determination of the case is the Conflict of Laws of the forum, the foreign law to be applied is the law applicable to the matter in hand and not the Conflict of Laws of the foreign state."

application of Maryland law, creating an "endless cycle." *Id.* Thus, the *Am. Motorists* Court adopted a rule to allow "Maryland courts to avoid the irony of applying the law of a foreign jurisdiction when that jurisdiction's conflict of law rules would apply Maryland law" and to break endless cycles. *Id.* at 579, 659 A.2d at 1304.

In particular, the Maryland Court of Appeals directed Maryland courts to apply Maryland law where, *id.* at 579, 659 A.2d at 1304:

> 1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and
>
> 2) The state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court.

The rule adopted by the Maryland Court of Appeals most often applies where there is no true "conflict" of laws. As Judge Howard Chasanow observed, *id.* at 576, 659 A.2d at 1303:

> In the absence of some reason to apply foreign law, Maryland courts would ordinarily apply Maryland substantive law, and there is no reason to apply the substantive law of a foreign state if that foreign state recognizes that Maryland has the most significant interest in the issues and that Maryland substantive law ought to be applied to the contract issues.

*See also Travelers Indem. Co. v. Allied-Signal, Inc.*, 718 F. Supp. 1252 (D. Md. 1989) (Motz, J.) (predicting that Maryland courts would apply *renvoi* to "pierce through 'false conflicts'"). According to Judge Chasanow, this conclusion is consistent with the "fundamental principle" that "Maryland law is Maryland law because our courts and legislature believe the rules of substantive law we apply are the best of the available alternatives" and that "our courts would prefer to follow Maryland law unless there is some good reason why Maryland law should yield to the law of a foreign jurisdiction." *Am. Motorists Ins.*, 338 Md. at 578, 659 A.2d at 1303-04.

Applying the doctrine of *renvoi* here, as adopted by the Maryland Court of Appeals in *Am. Motorists Ins.*, a Maryland Court would apply Maryland law to counts II through IV. With

respect to the first *Am. Motorists Ins.* prong, for the reasons explained in my analysis of §§ 188 and 196 of the Second Restatement, Maryland has the most significant relationship with the dispute.  Among other things, Macsherry was hired to work in Maryland and to secure the sale or lease of the Property, which is located in Maryland.  And, as to the second *Am. Motorists Ins.* prong, as explained, *supra*, a Missouri court applying the Second Restatement would likely apply Maryland law.

In view of the foregoing, a Maryland court applying Maryland's iteration of the doctrine of *renvoi* would apply Maryland law to counts II-IV of the Amended Complaint.

## IV.    Discussion

I begin with the contract and quasi contract claims and shall conclude with an analysis of the MWPCL claim.

### A.  Breach of Contract (Count II)

In Count II, Macsherry asserts a claim for breach of contract against CDC and SPLLC, alleging that he is entitled to a commission of 75 basis points as a result of the sale of the Property.  ECF 26, ¶¶ 27-32.

#### 1.  Maryland Contract Law

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'"  *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 17 A.3d 744, 749 (2011)).  To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v.*

*BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).   In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach."   *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).   In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals said:   "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'"   (Citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

In analyzing the claim for breach of contract, it is helpful to review the principles of contract formation and contract interpretation under Maryland law.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 Williston on Contracts § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).   "A contract is formed when an unrevoked offer made by one person is accepted by another."   *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984).   Thus, mutual assent is an integral component of every contract.   *See, e.g.*, *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015).   *See also Mitchell v. AARP*, 140 Md. App. 102, 116 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the

parties must be in agreement as to its terms.'") (citations omitted). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

A contract may be oral or written, as well as express or implied. "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'" *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Cnty. Comm'rs of Caroline Cnty v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000)) ("*Dashiell*"). Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *Cnty. Comm'rs for Carroll Cnty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377-78, 941 A.2d 1181, 1209-10 (2008); *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero v. Silverstein*, 142 Md. App. 259, 272, 790 A.2d 43, 51 (2002); *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

Under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157 A.3d 331, 335 (2017); *see also Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014) (citing *Towson Univ. v. Conte*, 384 Md. 68, 78, 862 A.2d 941, 946 (2004)); *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504, 513 (2003);

*Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134, 1136 (2017).

This includes the determination of whether a contract is ambiguous. *Sy–Lene of Wash., Inc. v.*

*Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

"'The cardinal rule of contract interpretation is to give effect to the parties' intentions.'"

*Dumbarton Imp. Ass'n. Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 51, 73 A.3d 224, 232

(2013) (citation omitted).   To determine the parties' intentions, courts look first to the written

language of the contract. *Walton v. Mariner Health of Maryland, Inc.*, 391 Md. 643, 660, 894

A.2d 584, 594 (2006) ("[G]enerally, when seeking to interpret the meaning of a contract our

search is limited to the four corners of the agreement."); *Hartford Acc. & Indem. Co. v. Scarlett*

*Harbor Assoc. Ltd. P'ship*, 109 Md. App. 217, 291, 674 A.2d 106, 142 (1996) ("[T]he court

must, as its first step, determine from the language of the agreement what a reasonable person in

the position of the parties would have meant at the time the agreement was effectuated."), *aff'd*,

346 Md. 122, 695 A.2d 153 (1997).

"Maryland courts interpreting written contracts have long abided by the law

of objective contract interpretation, which specifies that 'clear and unambiguous language' in an

agreement 'will not give way to what the parties thought the agreement meant or was intended to

mean.'" *Urban Growth Prop. Ltd. P'ship v. One W. Baltimore St. Assocs. LLC*, No. 882, Sept.

Term, 2015, 2017 WL 526559, at *5 (Md. Ct. Spec. App. Feb. 9, 2017) (citation omitted)

(unpublished); *see Cochran*, 398 Md. at 16, 919 A.2d at 709; *Huggins v. Huggins & Harrison,*

*Inc.*, 220 Md. App. 405, 417, 103 A.3d 1133, 1139 (2014) (internal quotations and alteration

omitted).  The court's "task, therefore, when interpreting a contract, is not to discern the actual

mindset of the parties at the time of the agreement . . . ." *Dumbarton Imp. Ass'n, Inc.*, 434 Md.

at 52, 73 A.3d at 232.  Rather, the court is to "'determine from the language of the agreement

itself what a reasonable person in the position of the parties would have meant at the time it was

effectuated.'" *Id.* (quoting *General Motors Acceptance v. Daniels,* 303 Md. 254, 261, 492 A.2d

1306, 1310 (1985)).

As indicated, to determine the parties' intentions, a court first looks to the written

language of the contract. *See Walton*, 391 Md. at 660, 894 A.2d at 594. "'The words employed

in the contract are to be given their ordinary and usual meaning, in light of the context within

which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632–

33 (2003) (citations omitted). A court will presume that the parties meant what they stated in an

unambiguous contract, without regard to what the parties to the contract personally thought it

meant or intended it to mean. *See Dumbarton*, 434 Md. at 51, 73 A.3d at 232; *Dennis v. Fire &*

*Police Employees Ret. Sys.*, 390 Md. 639, 656, 890 A.2d 737, 747 (2006); *PaineWebber Inc. v.*

*East*, 363 Md. 408, 414, 768 A.2d 1029, 1032 (2001); *see also, e.g.*, *Scarlett Harbor*, 109 Md.

App. at 291, 674 A.2d at 142 ("Where the language of a contract is clear, there is no room for

construction; it must be presumed that the parties meant what they expressed.").

Moreover, a court will not "add or delete words to achieve a meaning not otherwise

evident from a fair reading of the language used." *Brensdel v. Winchester Constr. Co.*, 392 Md.

601, 623, 898 A.2d 472, 485 (2006). Indeed, "[i]t is a fundamental principle of contract law that

it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the

parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.'"

*Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (*quoting Canaras v. Lift Truck*

*Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas.*

*& Sur. Co.*, 966 F.2d 1443 (Table), 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A]

court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Of relevance here, "[u]nder the objective view [of contract interpretation], a written contract is ambiguous if, when read by a reasonably prudent person, it is susceptible [to] more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d at 363 (citation omitted); *see Ocean Petroleum, Co. v. Yanek*, 416 Md. 74, 87, 5 A.3d 683, 690-91 (2010) (citation omitted); *Cochran*, 398 Md. at 17, 919 A.2d at 710; *Sy–Lene of Washington*, 376 Md. at 167, 829 A.2d at 547 (citations omitted); *Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999).  In a situation where the parties to a contract have not indicated that a particular term has "a special or technical meaning", the word is given its "ordinary and accepted meaning as used and understood by reasonably prudent laypersons in daily life." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 780-81, 625 A.2d 1021, 1032 (1993).  With regard to interpretation of a term, a court's "first resort is to a general dictionary . . . ." *Id.* at 781; 625 A.2d at 1032; *accord Megonnell v. United Servs. Auto. Ass'n.*, 368 Md. 633, 647, 796 A.2d 758, 767 (2002); *see also Sierra Club v. Dominion Cove Point LNG, L.P.*, 216 Md. App. 322, 335, 86 A.3d 82, 90 (2014) ("[W]e . . . begin with the dictionary definition to determine whether there is any ambiguity in the phrase.").

Ambiguity in a contract does not exist "simply because, in litigation, the parties offer different meanings to the language." *Diamond Point Plaza Ltd. P'ship v. Wells Fargo Bank, N.A.*, 400 Md. 718, 751, 929 A.2d 932, 952 (2007).  Moreover, "[a] term which is clear in one context may be ambiguous in another." *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617, 619 (1995).

Based on well established principles, "[if] the language employed in a contract is unambiguous, a court shall give effect to its plain meaning." *DIRECTV*, 376 Md. at 312, 829 A.2d at 630 (citations omitted).   No consideration of extrinsic evidence is necessary.   *Id.* (citations omitted); *see Clendenin Bros. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006).   Conversely, if the contract is ambiguous, "'the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.'"   *Cnty. Commissioners of Charles Cnty. v. St. Charles Associates Ltd. P'ship*, 366 Md. 426, 445, 784 A.2d 545, 556 (2001) (citation omitted); *accord John L. Mattingly Const. Co., Inc. v. Hartford Underwriters Ins. Co.*, 415 Md. 313, 327, 999 A.2d 1066, 1074 (2010).   Among other things, if a contract is ambiguous, "'extrinsic evidence may be consulted to determine . . . whether the ambiguous language has a trade usage.'"   *Mut. Fire Ins. Co. of Calvert Cty. v. Ackerman*, 162 Md. App. 1, 15, 872 A.2d 110, 118 (2005) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 404, 488 A.2d 486, 497 (1985)); *see also Della Ratta, Inc. v. Am. Better Cmty. Developers, Inc.*, 38 Md. App. 119, 130, 380 A.2d 627, 635 (1977).

"[I]f ambiguity is determined to remain after consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract' . . . ."   *Clendenin*, 390 Md. at 459-60, 889 A.2d at 394 (citations omitted).   Pertinent here, in the context of summary judgment, if "extrinsic evidence . . . leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must . . . be refused and interpretation left to the trier of fact.'" *Basile Baumann Prost Cole & Assocs., Inc. v. BBP & Assocs. LLC*, 875 F. Supp. 2d 511, 526 (D. Md. 2012) (*quoting Washington Metro. Area Transit. Auth. v. Potomac Inv. Props., Inc.,* 476 F.3d 231, 234 (4th Cir. 2007)) (alterations in *Basile*).

## 2.  Analysis

Macsherry refers to the Second Term Sheet as the "Contract".  *See* ECF 64-1 at 6 n. 1.
He also asserts that he signed a "clean" version of the Contract in St. Louis.  *Id.* at 6.

Plaintiff contends that "there is ample evidence that the parties intended to be bound by
the terms set forth in the Contract."  ECF 64-1 at 22.  In support of his argument, Macsherry
points out that "Schoelch told him that Mike Roberts had agreed to 'all the business terms' that
are set out in the Contract before he went to St. Louis.[1]"  ECF 64-1 at 23 (quoting ECF 64-4 at
82-83, 104-106).  Macsherry also argues that it is pertinent that defendants "only denied a
meeting of the minds concerning one single term listed in the Contract . . . ."  ECF 64-1 at 23.

Defendants offer three grounds to support summary judgment as to Count II.  First, they
contend that the Second Term Sheet is not an enforceable contract because any final agreement
that Macsherry signed was "contingent on Mike Roberts . . . executing a formal, written
document memorializing Macsherry's employment terms."  ECF 59-1 at 21.  In defendants'
view, the Second Term Sheet was nothing more than an "unenforceable agreement to agree."
ECF 67 at 6 (citing *Horsey v. Horsey*, 329 Md. 392, 420, 620 A.2d 305, 319 (1993)  and *Grooms
v. Williams*, 227 Md. 165, 172, 175 A.2d 575, 578 (1961)).  Second, defendants contend that,
viewing the Second Term Sheet in the light most favorable to Macsherry, there is an "utter lack
of definiteness and certainty as to the commission term."  ECF 67 at 11-14.  Third, defendants
argue that summary judgment is appropriate as to Count II because "there is no meaningful
evidence that the parties reached [a] final agreement to pay Macsherry a commission regardless
of whether Macsherry was the procuring cause of the sale."  *Id.* at 10-11 (emphasis omitted).

Roberts insists that he did not agree to pay a commission to Macsherry.  ECF 59-3, ¶ 16.
Rather, he claims that the Second Term Sheet was a mere agreement to agree.  *See, e.g.*, *Horsey*,

329 Md. at 420, 620 A.2d at 319 ("[I]t is generally held that an 'agreement to agree' is unenforceable."); *Grooms*, 227 Md. at 172, 175 A.2d at 578 ("There was, at best, an agreement to agree . . . , and this is not a sufficient basis for a specifically enforceable contract."); *Easley v. Easley*, No. 83, Sept. Term 2016, 2017 WL 1461637, at *4 n. 6 (Md. Ct. Spec. App. Apr. 25, 2017) (unreported) (observing that Maryland courts have found agreements to agree "too indefinite for courts to enforce"); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 178, 119 A.3d 175, 183 (2015) (noting that Maryland appellate courts have generally found agreements to agree to be unenforceable); *see also Evans v. PlusOne Sports, LLC*, ___ Fed. App'x ___, 2017 WL 1493697 (4th Cir. April 26, 2017) (concluding that, under Virginia law, a term sheet "roughing out an agreement" between two parties, which was never executed, was an unenforceable agreement to agree).

However, as explained below, in the light most favorable to Macsherry, summary judgment is not appropriate because Macsherry has produced evidence from which a reasonable finder of fact could conclude that Macsherry and CDC and/or SPLLC formed a valid contract. In particular, a finder of fact could determine that the Second Term Sheet was a binding contract contingent on a condition precedent that was satisfied. Or, if a finder of fact credits plaintiff's testimony, it could find that Macsherry executed an employment agreement in St. Louis that contained the same terms as the Second Term Sheet, and it constituted a binding contract.

With respect to the Second Term Sheet, Schoelch testified that he talked with Roberts about the terms in the First Term Sheet (ECF 59-10) and that Roberts approved them. ECF 64-7 at 48. Among other things, the First Term Sheet provided a salary of $50,000 and a commission term of "75 basis points paid on the total net value of any sales/leases or parcels." ECF 59-10. Macsherry expressed dissatisfaction with several terms, including the salary. ECF 59-6 at 77.

Thereafter, Schoelch prepared the Second Term Sheet.  Schoelch testified that he "would have talked about the terms" of the Second Term Sheet with Roberts.  ECF 64-7 at 55-56.  The Second Term Sheet reflects a higher salary than the one set forth in the First Time Sheet.  With respect to the commission, the only differences between the language of the commission term in the First Term Sheet and the Second Term Sheet are the deletion of the word "net" in the Second Term Sheet and the addition of the qualification that the commission would only be paid "on any deals closed after the Start Date.  Lafarge and Fritz deals excluded."  *See* ECF 59-11.

Macsherry testified that he accepted Schoelch's offer, as set forth in the Second Term Sheet.  Nevertheless, he also testified that he did not believe he was hired at that point; he knew the offer was contingent on his successful interview with Roberts.  Clearly, the interview was successful, because Macsherry began to work for CDC and/or SPLLC on the exact date specified in the Second Term Sheet.  And, the employer abided by all of the terms outlined in the Second Term Sheet, with only one exception: the commission.

In view of the foregoing, it is apparent that the deposition testimony of Schoelch and the Affidavit of Roberts are in conflict as to whether Roberts approved a commission.  The Court cannot resolve such a conflict in the context of a summary judgment motion.

As noted, Macsherry also testified that he signed an employment agreement during his trip to St. Louis in December 2012, which contained the same terms as the Second Term Sheet.  ECF 64-4 at 96-100.  Macsherry claims that Lydon said that she would have Roberts sign the document.  ECF 64-4 at 104.

As indicated, neither party has produced a copy of the executed employment agreement, and Roberts denies that he ever signed it.  However, that defendants have not produced the document does not compel a finding that it never existed.  Notably, in relevant communications

between Macsherry and Lydon, and between Macsherry and Schoelch, neither Schoelch nor Lydon denied the existence of the formal agreement. *See* ECF 59-14; ECF 59-15. The finder of fact could conclude that Macsherry executed an employment agreement in St. Louis that contained the terms set forth in the Second Term Sheet, which had been approved by Roberts.

Furthermore, defendants argue that summary judgment is appropriate as to Count II because, even if there was a contract, the commission term is so vague and indefinite that no enforceable contract could be formed with that term. ECF 64 at 11-14. As indicated, an agreement that is too vague or indefinite with respect to an essential term is not enforceable. *Mogavero*, 142 Md. App. at 272, 790 A.2d at 51.

In support of their position, defendants cite three Maryland cases: *Dolan v. McQuaide*, 215 Md. App. 24, 79 A.3d 394 (2013); *Goldstein v. Miles*, 159 Md. App. 403, 859 A.2d 313 (2004); and *Mogavero*, *supra*, 142 Md. App. 259, 790 A.2d 43. In each case, the Maryland Court of Special Appeals determined that it was not possible to discern the parties' obligations from the respective contracts. *See Dolan*, 215 Md. App. at 35, 79 A.3d at 400 (determining that the contract was unenforceable because "the alleged oral promises . . . would leave the court unable to determine whether [plaintiff] had satisfied her obligations"); *Goldstein*, 159 Md. App. at 432, 859 A.2d at 330 (concluding that a contract was unenforceable because it "did not contain any material terms of the sale", which made it "impossible to determine what the nature and extent of the parties' obligations were, if any"); *Mogavero*, 142 Md. App. at 271-72, 790 A.2d at 51 (explaining that based on the "vague wording of the 'oral agreement'', it was "impossible to know" a key component of the contract).

Here, the finder of fact can reasonably ascertain the obligations of the parties. Macsherry was to perform a list of enumerated duties on behalf of SPLLC and/or CDC. *See* ECF 59-11.

-43-

And, the employer agreed, *inter alia*, to pay Macsherry $77,000 per year and a commission. Viewing the facts in the light most favorable to Macsherry, Roberts agreed to the terms set forth in the Second Term Sheet, which were accepted by Macsherry.  The terms of the Second Term Sheet are not so vague or indefinite as to render them unenforceable as a matter of law.

In addition, defendants argue that they are entitled to summary judgment because "there is no meaningful evidence that the parties reached [a] final agreement to pay Macsherry a commission regardless of whether Macsherry was the procuring cause of the sale."  ECF 67 at 10-11 (emphasis omitted).   Defendants maintain that the term "commission" has a special meaning in the context of real estate transactions.  ECF 59-1 at 23.  They argue that, in "the context of real estate, to earn a 'commission,' one must be responsible for (i.e., be the proximate or procuring cause of) the transaction."  *Id*.  Because Macsherry did not procure the sale of the Property, defendants contend that plaintiff is not entitled to a commission.  Macsherry maintains that he performed a role in the sale of the Property.  In any event, he also suggests that, based on the plain language of the agreement, he merely had to be an employee at the time of closing in order to qualify for a commission, subject to the exclusion of transactions with Lafarge and Fritz.

As noted earlier, the Second Term Sheet provides, ECF 59-11: "Commission . . . 75 basis points paid on the total value of *any* sales/leases or parcels on *any* deals closed after the Start Date.  Lafarge and Fritz deals excluded."  (Emphases added).  The plain language suggests that Macsherry would obtain a commission for "any" deal during his employment, subject to two qualifications.  First, the sale or lease must close after Macsherry's start date.  *Id*.  Second, Macsherry would receive no commission on the sale or lease of the Property with respect to the Lafarge and Fritz "deals."  *Id.*  The text does not expressly require Macsherry to procure a sale or a lease in order to qualify for a commission.

Assuming the existence of a contract, the question for the Court on summary judgment is whether the term "commission" unambiguously entitled plaintiff to a commission for "any deal", as plaintiff suggests, or unambiguously and inherently required Macsherry to procure the sale in order to receive the commission, as defendants argue.

Under Maryland law, I may examine dictionary definitions of the term "commission." *See, e.g.*, *Bausch & Lomb*, 330 Md. at 781, 625 A.2d at 1032. Black's Law Dictionary defines "commission" as follows: "A fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction <a real-estate agent's commission>." *Commission*, Black's Law Dictionary (10th ed. 2014). The Oxford English Dictionary defines "commission" as: "Payment, or a payment, for services or work done as an agent in a commercial transaction, typically a set percentage of the value involved." *Commission*, Oxford English Dictionary, Online Edition (March 2017), *available at*: http://bit.ly/2tqtDgX. Merriam-Webster defines "commission" as: "[A] fee paid to an agent or employee for transacting a piece of business or performing a service; *especially*: a percentage of the money received from a total paid to the agent responsible for the business." *Commission*, Merriam-Webster online ed. (June 2017), *available at*: http://bit.ly/2ssO13W.

Plaintiff's interpretation – that he was to receive a commission without regard to whether he personally procured the sale – finds some support in Black's Law Dictionary and the Oxford English Dictionary. Neither of those definitions provides that, to obtain a commission, a person must procure the sale. Defendants' interpretation finds some support from Merriam-Webster, which provides that the term "commission" often refers to money paid to an agent "responsible for the business." The definitions in Black's Law Dictionary and the Oxford English Dictionary on one the hand, and Merriam-Webster on the other hand are not in harmony.

The word "commission" here may have a special, technical meaning.  *See Ackerman*, 162 Md. App. at 15, 872 A.2d at 118.  And, as used here, it could be susceptible to more than one meaning.  Accordingly, I conclude that the term is ambiguous.

Where a term is ambiguous, the court may consider extrinsic evidence "'which sheds light on the intentions of the parties at the time of the execution of the contract.'"  *Cnty. Comm'rs of Charles Cnty.*, 366 Md. at 445, 784 A.2d at 556 (citation omitted).  Here, there is conflicting extrinsic evidence as to the parties' intentions.  Roberts stated in his Affidavit that he never approved of the commission term in the Second Term Sheet and never agreed to pay Macsherry any commission.  ECF 59-3, ¶¶ 15-16.  Conversely, Macsherry testified that the commission term represented a means for CDC and/or SPLLC to compensate him for a low salary.  ECF 59-6 at 260-61.  Macsherry's understanding as to entitlement to a commission is supported by Schoelch, who testified that a commission "was one part of the compensation" and that Macsherry "would be paid as land was sold."  ECF 64-7 at 58.

Because the term "commission" in the Second Term Sheet is ambiguous, the resolution of its meaning must await trial, as it may turn on extrinsic evidence, including the credibility of the witnesses and the applicability of a specialized definition in the context of real estate transactions.  Therefore, summary judgment is not appropriate.  *Bauman Prost Cole & Assocs.*, 875 F. Supp. 2d at 526.

### 3.  Statute of Frauds

Defendants argue that, even if a contract was formed between Macsherry and SPLLC and/or CDC, summary judgment is appropriate because the contract does not comply with the statute of frauds.  ECF 67 at 19-22.

Maryland's statute of frauds is codified at Md. Code (2013 Repl. Vol., 2016 Supp.), § 5-901 of the Courts and Judicial Proceedings Article ("C.J."). C.J. § 5-901 provides (emphasis added):

> Unless a contract or agreement upon which an action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or another person lawfully authorized by that party, an action may not be brought:
>
> > (1) To charge a defendant on any special promise to answer for the debt, default, or miscarriage of another person;
> >
> > (2) To charge any person on any agreement made on consideration of marriage; or
> >
> > **(3) On any agreement that is not to be performed within 1 year from the making of the agreement.**

In other words, the Maryland statute of frauds bars the enforcement of a contract that cannot be performed within one year, unless the agreement "or some memorandum or note of it, is in writing and signed by the party to be charged." *Salisbury Bldg. Supply Co. Inc. v. Krause Marine Towing Corp.*, 162 Md. App. 154, 160, 873 A.2d 452, 456 (2005) (citing C.J. § 5-901(3) and *General Federal Construction, Inc. v. James A. Federline, Inc.*, 283 Md. 691, 693, 393 A.2d 188 (1978)).

In an exhaustive review, the Maryland Court of Appeals addressed the meaning of C.J. § 5-901(3) in *General Federal Construction*, 283 Md. 691, 393 A.2d 188. *Id.* There, the court ruled: "[T]he 'one year clause' of the Maryland Statute of Frauds does not bar collection of damages for breach of an oral contract absent an express and specific provision in that contract that it was not to be performed within one year or a clear demonstration by its terms that it was not or could not be so performed." *Id.* at 692, 393 A.2d at 189. In other words, the statute of frauds does not apply to a contract that was likely, or nearly certain, to take more than one year to perform, if it *could*, with unlimited resources, be performed within one year. *Id.* at 696, 393 A.2d at 191 (citing *Warner v. Texas & P. Ry.*, 164 U.S. 418 (1896)); *see also Griffith v. One Inv.*

*Plaza Assocs.*, 62 Md. App. 1, 7, 488 A.2d 182, 185 (1985) ("'The statute does not apply if the contract can, by any possibility, be completed within a year, although the parties may have intended that its operation should extend over a much longer period, and in fact, it does so extend.'") (quoting *Home News, Inc. v. Goodman,* 182 Md. 585, 594, 35 A.2d 442, 446 (1944)).

Construing the facts in the light most favorable to Macsherry, the statute of frauds is not applicable because the employment agreement could have been fully performed in less than one year. The undisputed purpose of Macsherry's employment with CDC and/or SPLLC was to facilitate the sale or lease of the Property. *See, e.g.*, ECF 59-5 (Roberts Deposition) at 85-86; ECF 59-11 (second term sheet). Although the Second Term Sheet lists a start date (December 10, 2012), it does not list an end date. *See* ECF 59-11. Given these facts, the Court can reasonably infer that the employment agreement would have terminated upon the sale of the Property, which could have happened at any time. The fact that Macsherry's employment ultimately lasted more than one year is of no consequence.

## B.      Promissory Estoppel (Count III)

In Count III of the Amended Complaint, Macsherry asserts a claim for promissory estoppel. *See* ECF 26, ¶¶ 33-39. "[I]n Maryland, promissory estoppel is an alternative means of obtaining contractual relief." *Maryland Transp. Auth.*, 195 Md. App. at 215, 5 A.3d at 1227; *see also Pavel Enterprises, Inc. v. A.S. Johnson Co.*, 342 Md. 143, 169, 674 A.2d 521, 534 (1996) ("[T]here are different ways to prove that a contractual relationship exists . . . . Traditional bilateral contract theory is one. Detrimental reliance [a.k.a. promissory estoppel] can be another."); *Suburban Hosp., Inc., supra*, 807 F. Supp. at 33 (applying Maryland law, and stating that "the nature of a lawsuit in which promissory estoppel is invoked remains that of an action to enforce a contract").

The elements of a promissory estoppel or detrimental reliance claim in Maryland were established in the touchstone case of *Pavel Enterprises, Inc.*, *supra*, 342 Md. at 166, 674 A.2d at 533:

1. a clear and definite promise;
2. where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee;
3. which does induce actual and reasonable action or forbearance by the promisee; and
4. causes a detriment which can only be avoided by the enforcement of the promise.[]

*Accord Citiroof Corp. v. Tech Contracting Co., Inc.*, 159 Md. App. 578, 589, 860 A.2d 425, 432 (2004); *Konover Prop. Trust, Inc.*, *supra*, 142 Md. App. at 484, 790 A.2d at 724.

Under Maryland law, a claim for money damages based on promissory estoppel is a claim at law. *Ver Brycke*, 379 Md. at 698, 843 A.2d at 775 (stating that plaintiffs' unjust enrichment and promissory estoppel claims "were claims at law because they were claims seeking the remedy of restitution for money"). Characterizing promissory estoppel as a "quasi-contract" claim, the Maryland Court of Appeals said in *Ver Brycke*, *id.* at 693 n.9, 843 A.2d at 772 n.9: "'The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests.'" *Id.* (quoting *Dashiell*, 358 Md. at 96, 747 A.2d at 607).

Macsherry maintains that he was employed pursuant to a written contract. *See* ECF 64-4 at 96-100. Conversely, defendants contend that plaintiff never had a valid contract with any defendant. However, if there is no valid contract, as defendants maintain, then plaintiff may pursue a quasi-contractual claim. Indeed, Fed. R. Civ. P. 8(d)(3) permits a party to "state as many separate claims . . . as it has, regardless of consistency." Although a plaintiff "may not recover under both contract and quasi-contract theories, [he] is not barred from pleading these

theories in the alternative. . . ."  *Swedish Civil Aviation Administration v. Project Management Enters., Inc.*, 190 F. Supp. 2d 785, 792 (D. Md. 2002).

Defendants argue that Macsherry's claim for promissory estoppel "fails for the same reasons that his breach of contract claim fails."  ECF 59-1 at 24.  In defendants' view, Macsherry has "no evidence of a promise to a gratuitous commission, reliance on that promise, damages, or injustice."  *Id.*  Moreover, defendants assert: "[T]here is simply no evidence that Macsherry took different action than he otherwise would have due to the alleged promise of a 'commission,' nor is there any evidence that Macsherry suffered a 'detriment.'"[1]  ECF 67 at 19.

In response, Macsherry argues that defendants have offered "no argument in favor of granting summary judgment against Plaintiff concerning his promissory estoppel claim."  ECF 64-1 at 24.  In effect, he adopts his arguments as to his breach of contract claim.

In my view, summary judgment is not appropriate as to Count III.  As an initial matter, the resolution of the breach of contract claim resolves the first element of the promissory estoppel claim, with respect to a clear and definite promise.  Namely, there is evidence from which a reasonable finder of fact could determine that CDC and/or SPLLC made a clear and definite promise to pay Macsherry for services rendered, including a commission.

Defendants have not commented on the second element of promissory estoppel, *i.e.*, that the promissor had a reasonable expectation that the offer would induce action or forbearance on the part of the promissee.  *See* ECF 59-1 at 24; ECF 67 at 18-19.  Clearly, it is reasonable to infer that SPLLC and/or CDC induced Macsherry to take the job, and the alleged promise of a commission was part of that inducement.

With respect to the third element of promissory estoppel, *i.e.*, that the conflict induces reasonable action or forebearance, plaintiff has produced evidence that he took a different course

of action from what he otherwise would have taken, based on the commission term.   In particular, Macsherry testified that part of the purpose of the commission was to "compensate for the low salary."  ECF 59-6 at 260.  Given this statement, one can reasonably infer that Macsherry decided to take the job, at least in part, based on the promise of a commission.  The fact that Macsherry was unemployed prior to obtaining the position with SPLLC and/or CDC (ECF 67 at 19 n. 8) does not compel the conclusion that Macsherry would have accepted a job with compensation he deemed too low.

Detrimental reliance is the fourth element of a promissory estoppel claim.  The fact-finder could infer that Macsherry did not seek or obtain another job during the term of his employment because he accepted the position with defendants, with the expectation of a commission.

Summary judgment is inappropriate as to Count III.[12]

## C.      Quantum Meruit (Count IV)

In Count IV of the Amended Complaint, Macsherry asserts a claim for quantum meruit. ECF 26, ¶¶ 40-46.

"The Latin term *quantum meruit* means 'as much as deserved.'" *Mogavero*, 142 Md. App. at 274, 790 A.2d at 51 (quoting BLACK'S LAW DICTIONARY 1243 (6th ed. 1990)); *see also Blanton v. Friedberg*, 819 F.2d 489, 492 (4th Cir. 1987) ("'The impact of quantum meruit is to allow a promisee to recover the value of services he gave to the defendant irrespective of whether he would have lost money on the contract and been unable to recover in a suit on the contract.'") (citation omitted); *Swedish Civil Aviation Admin.*, *supra*, 190 F. Supp. 2d at 793

---

[12] For the reasons stated, *supra*, the statute of frauds would be inapplicable to Macsherry's promissory estoppel claim because Macsherry's contract could have been performed in less than one year.

("'By its term, *quantum meruit* is a method of obtaining a reasonable value for services'")

(quoting *First Union Nat'l Bank v. Meyer, Faller, Weisman, & Rosenberg, P.C.*, 125 Md. App.

1, 23, 723 A.2d 899 (1999)). The Fourth Circuit explained in *Blanton*, 819 F.2d at 492 (quoting

*W.F. Magann Corp. v. Diamond Manufacturing Co.*, 775 F.2d 1202, 1208 (4th Cir.1985)):

> "One who has rendered a service or supplied work, labor and materials under a contract with another, but who has been wrongfully discharged or otherwise prevented from so fully performing as to earn the agreed compensation, may regard the contract as terminated and get judgment for the reasonable value of all that the defendant has received in performance of the contract ...
>
> The underlying purpose of allowing *quantum meruit* recovery is two-fold, i.e. to prevent the breaching party from being unjustly enriched and to restore the aggrieved party in the contract to the position he occupied prior to entry into the contract. *Quantum meruit* merely seeks to return to the plaintiff the reasonable value of the services and goods provided to the defendant."

Under Maryland law, a claim for quantum meruit may be based on a contract implied in

fact or a contract implied by law, which is often referred to as unjust enrichment. *Mogavero*, 142

Md. App. at 275, 790 A.2d at 52. These terms have "distinct meanings." *Dashiell*, *supra*, 358

Md. at 95 n.6, 747 A.2d at 606 n.6; *see Alternatives Unlimited, Inc. v. New Baltimore City Board*

*of School Comm'rs*, 155 Md. App. 415, 482-87, 843 A.2d 252, 291 (2004); *Mohiuddin v.*

*Doctors Billing & Management Solutions, Inc.* 196 Md. App. 439, 447, 9 A.3d 859, 864 (2010).

The Fourth Circuit explained in *Sanders v. Mueller*, 133 Fed. Appx. 37, 42 n.3 (4th Cir. 2005):

"Maryland law distinguishes between two types of quantum meruit claims, one based on an

implied-in-fact contract (usually designated as quantum meruit) and the other based on an

implied-in-law contract (usually designated as unjust enrichment)."

It appears from the Amended Complaint that Macsherry asserts his quantum meruit claim

using theories of unjust enrichment and implied-in-fact contract. ECF 26, ¶¶ 42-46. I review

each, in turn.

### 1.   Unjust Enrichment

In Maryland, a quantum meruit claim based on quasi contract, *i.e.*, a contract implied in law, is the same as a claim of unjust enrichment. *Mohiuddin*, 196 Md. App. at 447, 9 A.3d at 864.   "'Quasi-contracts have often been called implied contracts or contracts implied in law[.]'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *accord Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 ("A contract implied by law is now what commonly is called quasi-contract . . . ."). However, "'unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises.   *They are obligations created by law for reasons of justice*.'" *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (citation omitted) (emphasis in *Mohiuddin*).

"A claim of unjust enrichment . . . is not based on contract . . . .   It is based on quasi-contract, and a quasi-contract, notwithstanding its name, is not a real contract."   *Id*.   In other words, "[t]o prevent unjust enrichment, the law created a contract, as an unabashed legal fiction." *Alternatives Unlimited*, 155 Md. App. at 472, 843 A.2d at 286.

Unjust enrichment and quantum meruit "'are remedies to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.'"   *Dashiell*, 358 Md. at 96-97, 747 A.2d at 607 (quoting *Dunnaville v. McCormick & Co.*, 21 F.Supp.2d 527, 535 (1998)).   "The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests."   *Dashiell*, 358 Md. at 96, 747 A.2d at 607; *see Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) ("In Maryland, a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties.") (Internal quotation

marks omitted); *Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *see also FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties.").

In Maryland, "[a] claim of unjust enrichment is established when: (1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *Dashiell*, 358 Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin*, 190 F. Supp. 2d at 792-93.

In *Alternatives Unlimited*, the Maryland Court of Special Appeals explained, *id.* at 480, 843 A.2d at 290:

> A quasi-contract or *implied in law contract . . . involves no assent between the parties, no* "*meeting of the minds.*" Instead the law implies a promise on the part of the defendant to pay a particular "debt." Thus, "[*t*]*he implied in law contract is indeed no contract at all*, it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense."

(Quoting *Mass Transit Administration v. Granite Construction Co.*, 57 Md. App. 766, 775, 471 A.2d 1121, 1125-26 (1984) (emphasis added in *Alternatives Unlimited*)); *accord Mogavero*, 142 Md. App. at 275, 790 A.2d at 52.

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill*, 402 Md. at 295-96, 936 A.2d at 352 (citation omitted); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000). But, "[g]enerally, courts are hesitant to deviate from the principle of the rule and allow unjust enrichment claims only when there is evidence of fraud or bad faith,[] there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted,[] or when the express contract does not fully address a subject matter.[]" *Dashiell*, 358 Md. at 100, 747 A.2d at 608-09.

In plaintiff's unjust enrichment claim, he contends that he conferred a benefit upon the defendants by working for them in selling the Property, and that defendants were able to sell the Property for $110,000,000 as a result of his efforts. ECF 26, ¶¶ 42-44; ECF 59-6 at 260-61; ECF 64-4 at 154. Defendants argue: "Macsherry has no evidence that he conferred a benefit upon Defendants outside of the scope of his employment." ECF 59-1 at 36. They point out that Macsherry was paid a salary and received benefits "annually in excess of $90,000 a year." *Id.* And, defendants argue that Macsherry "had no substantive role in the sale transaction." ECF 67 at 25. In response to defendants' arguments, Macsherry states only that he "has marshalled ample evidence in support of his *quantum meruit* claim, making the grant of summary judgment inappropriate." ECF 64-1 at 33.

In my view, summary judgment is inappropriate as to plaintiff's claim of unjust enrichment, because there are disputes of material fact concerning Macsherry's role regarding the sale of the Property. A reasonable finder of fact could conclude that Macsherry provided a

benefit to CDC and/or SPLLC and was undercompensated for that benefit because defendants failed to pay him some commission.

## 2. Implied-in-Fact Contract

In the Amended Complaint, Macsherry claims that defendants "accepted Plaintiff Macsherry's services, received the benefit of such services, and knew that Plaintiff Macsherry expected to be compensated for those services through his salary and promised commission." ECF 26, ¶ 43. This claim sounds in the theory of an implied-in-fact contract.

An implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin*, 196 Md. App. at 448, 9 A.3d at 865 (quoting 1 RICHARD A. LORD, WILLISTON ON CONTRACTS, § 1.5, pp. 20-21 (1990)) (emphasis in *Mohiuddin*). *See also Dashiell*, 358 Md. at 94, 747 A.2d at 606 ("An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men.") (internal quotation and citations omitted); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Administration v. Granite Construction Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed comments added in *Slick*).

"An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'" *Mogavero*, 142 Md.

App. at 275, 790 A.2d at 52 (citation omitted).  Put another way, "[a]n implied by fact contract is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'" *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted).

In *Mohiuddin*, Judge Moylan, writing for the Maryland Court of Special Appeals, noted that the appellant's complaint did not specify the type of quantum meruit theory on which the appellant relied.  Because the appellant had also brought an unjust enrichment claim, that court "assume[d] that appellant's complaint is not redundant and that his *quantum meruit* claim sounds in implied-in-fact contract law."  *Mohiuddin*, 196 Md. App. at 447, 9 A.3d at 864 (citing *Alternatives Unlimited, Inc.*, 155 Md. App. at 488-89, 843 A.2d at 294-95.  The *Mohiuddin* Court determined that the trial judge correctly dismissed the plaintiff's quantum meruit claim.  It reasoned, *Mohiuddin*, 196 Md. App. at 448-49, 9 A.3d at 865:

> Appellant clearly pled that he performed work for PHC [one of the defendants,] for which he expected compensation, and that PHC accepted appellant's services with the knowledge that he expected compensation. Fatal to appellant's *quantum meruit* claim, however, is the absence of any allegation that either appellant or PHC had agreed that PHC was obligated to pay appellant for his services. Without this critical allegation, to wit, that both parties intended that PHC . . . was required to pay appellant for his services, appellant failed to plead the existence of a mutual agreement between the parties. Because appellant did not allege a meeting of the minds between himself and PHC, his *quantum meruit* claim is legally deficient.

And, in *Mogavero*, 142 Md. App. at 277, 790 A.2d at 53, the Maryland Court of Special Appeals explained the difference between a true contract and a contract implied in fact: "'A true implied contract, or contract implied in fact, does not describe a legal relationship which differs from an express contract: only the mode of proof is different.'"  (Citation omitted).  Similarly, in *Slick*, 154 Md. App. at 318, 839 A.2d at 787, Judge Moylan said: "'[T]he [implied in fact]

contract *is proved by circumstantial evidence*.'"   (Citation omitted; emphasis in original; brackets added in *Slick*).

Defendants argue that summary judgment is appropriate because "Macsherry received a salary and benefits over the course of his employment."   ECF 59-1 at 37.   According to defendants, there is "no evidence that Macsherry performed extra services for either CDC or SPLLC for which he and Defendants expected him to receive additional compensation."   And, defendants assert that "there is no evidence of a meeting of the minds between the parties that is consistent with Macsherry's interpretation of the commission term."   ECF 67 at 25-26.   In his reply, Macsherry asserts that he has "marshalled ample evidence" in support of his quantum meruit claim.   ECF 64-1 at 33.

Viewing the facts in the light most favorable to Macsherry, and resolving reasonable inferences in his favor, for the reasons stated with respect to Count II, the fact-finder could conclude that Roberts agreed to pay a commission to Macsherry.   And, as indicated in my discussion with respect to Count II, whether Macsherry would be entitled to a commission even if he did not personally procure the buyer of the Property cannot be resolved on summary judgment.   But, the finder of fact could conclude, based on the parties' conduct and the existence of the Second Term Sheet, that Macsherry rendered services with the expectation of a commission and that defendants received the benefit of those services.   Accordingly, summary judgment is inappropriate.

### D.    MWPCL

In Count I of the Amended Complaint, Macsherry claims that defendants violated the Maryland Wage Payment & Collection Law by failing to pay him a commission of $825,000 following the sale of the Property.   ECF 26, ¶¶ 22-26.

Defendants urge the Court to enter summary judgment in their favor on two grounds: (1) that there was no enforceable agreement for the payment of the commission and (2) that even if there was an enforceable agreement, the commission was not a compensable "wage" under the MWPCL.  ECF 59-1 at 29.  Macsherry has moved for partial summary judgment, solely on the question of whether Roberts constituted an "employer" within the meaning of the statute.  ECF 64.

Among other things, the MWPCL "protects employees from wrongful withholding of wages upon termination."  *Stevenson v. Branch Banking and Trust Corporation, t/a BB&T*, 159 Md. App. 620, 635, 861 A.2d 735, 743 (2004) (citing L.E. § 3-505).  "The principal purpose of the Act 'was to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'"  *Medex v. McCabe*, 372 Md. 28, 39, 811 A.2d 297, 304 (2002) (citation omitted).  The MWPCL does not focus on "the amount of wages payable but rather the duty to pay whatever wages are due on a regular basis and to pay all that is due following termination of the employment."  *Friolo v. Frankel*, 373 Md. 501, 513, 819 A.2d 354, 362 (2003).

L.E. § 3-505(a) governs payments to an employee upon termination.  It provides, in part: "[E]ach employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated."  The MWPCL provides an employee with the right to bring a civil suit against an employer to recover unpaid wages.  *See* L.E. § 3-507.2(a)[13]; *Mohiuddin*, 196 Md. App. at 446, 9 A.3d at 863.

In particular, under the MWPCL, if an employer fails to pay an employee all wages due on termination of employment, "after 2 weeks have elapsed from the date on which the employer

---

[13] This provision was previously codified at L.E. § 3-507.1.  *See* Section 1, Ch. 151, Acts of 2010.

is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages." L.E. § 3-507.2(a); *see Baltimore Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 382-83, 780 A.2d. 303, 312-13 (2001). Of relevance here, the term "wage" includes commissions; bonuses when they are compensation for services and not a gratuity; and work-related incentive fees. L.E. § 3-501(c)(2); *see Medex*, 372 Md. at 35-37, 811 A.2d at 302; *Whiting-Turner v. Fitzpatrick*, 366 Md. 295, 306; 783 A.2d 667, 673 (2001). If "a court finds that an employer withheld the wage of an employee in violation of [the MWPCL] and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." L.E. § 3-507.2(b).

An "employer" within the purview of the MWPCL includes "any person who employs an individual in the State or a successor of the person." L.E. § 3-501(b). The term "employ" means "to engage an individual to work," L.E. § 3-101(c)(1), including "allowing an individual to work" and "instructing an individual to be present at a work site." L.E. § 3-101(c)(2)(i) and (ii). *See also Mohiuddin*, 196 Md. App. at 446, 9 A.3d at 863. However, a "mere supervisor" is not an employer within the meaning of the MWPCL. *Watkins v. Brown*, 173 F. Supp. 2d 409, 415-16 (D. Md. 2001); *see also Bouthner v. Cleveland Construction, Inc.*, RDB-11-244, 2011 WL 2976868, at *7 (D. Md. Jul. 21, 2011); *Hosack v. Utopian Wireless Corp.,* DKC-11-420, 2011 WL 1743297, *5 (D. Md. May 6, 2011).

The MWPCL does not define "employee." But, in *Ayd*, 365 Md. at 384-85, 780 A.2d at 314, the Maryland Court of Appeals made clear that the MWPCL's provisions extend to executive and professional employees. The court stated: "[I]f the General Assembly had intended to exclude administrative, executive and professional employees from the provisions of §§ 3-505 and [3-507.2], or otherwise limit the application of these provisions to that class of

employees, it would have expressly done so.[]"  *Id.* at 385, 780 A.2d at 314.  The court reasoned

that the use of the word "employee" in the statute was meant to distinguish independent

contractors from the traditional common law concept of master/servant.  *Id.* at 387-88, 780 A.2d

at 315-16.

## 1.  Defendants' Motion – MWPCL Claim

As noted, defendants seek summary judgment on the ground, *inter alia*, that there was no

enforceable agreement for payment of a commission.  For the reasons stated previously, there is

a genuine dispute of material fact as to this issue.  Therefore, I turn to defendants' second

contention, *i.e.*, that a commission is not a compensable "wage" under the MWPCL.

In defendants' view, the commission is not a wage because Macsherry did not do any

work to earn it.  ECF 59-1 at 31-32.  They explain that "Macsherry cannot demonstrate that the

alleged commission had any material nexus to his employment efforts" because Macsherry had

no role in procuring the ultimate purchasers of the Property and did not otherwise meaningfully

participate in the sale.  *Id.* at 32.

As indicated, the term "wage" is defined by the MWPCL as "all compensation that is due

to an employee for employment."  L.E. § 3-501(c).  The term "wage" includes commissions.  *See*

L.E. § 3-501(c)(2)(ii); *Medex*, 372 Md. at 35, 811 A.2d at 302 ("Commissions are clearly within

the scope of the Act . . . .") *see also Hausfeld*, *supra*, 131 F. Supp. 3d at 454 ("Commissions are

wages for the purposes of the MWPCL."); *Abelman v. Wells Fargo Bank, N.A.*, 976 F. Supp. 2d

660, 663 (D. Md. 2013) ("[T]he MWPCL requires an employer to pay commissions to a former

employee if the employee has done everything required to earn that commission before his or her

termination.").  But, under the MWPCL, "[w]here the payments are dependent upon conditions

other than the employee's efforts, they lie outside of the definition."  *Medex*, 372 Md. at 36, 811

A.2d at 302.  This is because, as stated by the *Medex* Court, "it is the exchange of remuneration for the employee's work that is crucial to the determination that compensation constitutes a wage."  *Id.*

Defendants correctly point out that Macsherry stated that one of the purposes of the commission term was to "incentivize him to get deals done."  *See* ECF 59-6 at 260-61; ECF 59-1 at 32.  However, Macsherry also explained that the commission was a mechanism for SPLLC and/or CDC to compensate him for a "low salary" and to pay him as deals closed.  *See* ECF 59-6 at 260-61.  Based on Macsherry's testimony, there is evidence that supports the conclusion that the commission was part of the remuneration for Macsherry's efforts.  *Medex*, 372 Md. at 36, 811 A.2d at 302.

In light of Macsherry's testimony, the Court cannot conclude at this point that the commission term was a gratuitous payment, "dependent upon conditions other than the employee's efforts . . . ."  *Medex*, 372 Md. at 36, 811 A.2d at 302.  Thus, summary judgment is not appropriate under the MWPCL.

### 2.  Defendants' Motion – *Bona Fide* Dispute

Defendants argue that even if the Court does not grant summary judgment as to Count I, the Court should make a finding that there was a bona fide dispute with respect to Macsherry's commission and that defendants did not act in bad faith in refusing to pay Macsherry the $825,000.

As stated, under L.E. § 3-507.2(b), if a court finds that an employer withheld a wage in violation of the MWPCL, "the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs" if the violation was "not as a result of a bona fide dispute . . . ."  *See also Rogers v. Sav. First Mortg., LLC*, 362 F. Supp. 2d 624, 648 (D.

Md. 2005); *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 657, 97 A.3d 621, 627 (2014).

According to the Maryland Court of Appeals, a "bona fide dispute" is "'a legitimate dispute over

the validity of the claim or the amount that is owing []' where the employer has a good faith

basis for refusing an employee's claim for unpaid wages." *Peters*, 439 Md. at 657, 97 A.3d at

621 (quoting *Admiral Mort., Inc. v. Cooper*, 357 Md. 533, 543, 745 A.2d 1026, 1031 (2000))

(alterations in *Peters*).   Notably, the "inquiry into whether an employer's withholding of wages

was the result of a bona fide dispute is one concerned with the employer's 'actual, subjective

belief that the party's position is objectively and reasonably justified.'" *Id.* (quoting *Barufaldi v.

Ocean City, Md. Chamber of Commerce, Inc.*, 206 Md. App. 282, 293, 47 A.3d 1097, 1103

(2012)).

The *Peters* Court adopted a burden-shifting framework in determining whether an

employer acted in good faith in withholding wages.   *Peters*, 439 Md. at 658, 97 A.3d at 627-28.

According to the *Peters* Court, the burden of production begins with the employer because the

employer "is in the best position to bring forward evidence concerning its own subjective belief

as part of establishing a bona fide dispute."   *Id.* at 658, 97 A.3d at 628.   Once the employer

produces evidence, the burden of production shifts back to the employee "to rebut the

employer's reason."   *Id.* But, the ultimate burden of proof rests with the employee.   *Id.*

In general, "[t]he existence of a bona fide dispute under [§ 3–507.2] is a question of fact

left for resolution by the jury, not the trial judge."   *Ayd*, 365 Md. at 396, 780 A.2d at 320-21;

*accord Fenzel v. Grp. 2 Software, LLC*, DKC 13-0379, 2016 WL 865363, at *12 (D. Md. Mar. 7,

2016); *Hausfeld*, 131 F. Supp. 3d at 465; *Gresham v. Lumberman's Mut. Cas. Co.*, 426 F. Supp.

2d 321, 325 (D. Md. 2005), *aff'd*, 173 Fed. App'x 220 (4th Cir. 2006); *Medex*, 372 Md. 44, 811

A.2d at 307.   Nevertheless, "in order for an employee to withstand a summary judgment motion,

there must be 'sufficient evidence adduced to permit a trier of fact to determine that . . . [the employer] did not act in good faith when it refused to pay . . . .'" *Gresham*, 426 F. Supp. 2d at 325 (quoting *Admiral Mort*, 357 Md. at 543, 745 A.2d at 1031) (alterations in *Gresham*).

Here, as evidenced by the colorable arguments advanced in this litigation, defendants have made an initial showing that they acted in good faith when they refused to pay Macsherry a commission. But, Macsherry has also produced evidence that, in the light most favorable to him, creates a reasonable dispute as to whether CDC and/or SPLLC acted in good faith in withholding the commission. In particular, Macsherry testified that during a telephone conversation with Roberts after the deal on the Property had closed, Roberts said, ECF 64-4 at 229: "Yes, I know we owe you a commission, but I don't think you deserve as big a commission. What will you take[?]" Macsherry also testified that Roberts told him that Roberts wanted to "negotiate" the commission. *Id.* at 236.

A reasonable finder of fact could conclude that Roberts, SPLLC, and/or CDC knew that Macsherry was owed a commission as to the sale of the Property. Thus, summary judgment is inappropriate.

### 3. Plaintiff's Cross-Motion

Macsherry asks the Court to grant partial summary judgment to him, finding that Roberts, in his personal capacity, was Macsherry's employer within the meaning of the MWPCL. ECF 64.

As noted, the MWPCL defines employer to "include[] any person who employs an individual in the State or a successor of the person." L.E. § 3-501(b). Notably, a person can have more than one employer at a given time. *See Newell v. Runnels*, 407 Md. 578, 650, 967 A.2d 729, 771 (2009).

In Maryland, in the context of wage payment cases, "'[t]he decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct the employee in the performance of the work and in the manner in which the work is to be done.'"  *Mohiuddin, supra*, 196 Md. App. at 446, 9 A.3d at 863-64 (citations omitted).   In analyzing the parameters of an "employer" under the MWPCL, the 2012 case of *Campusano v. Lusitano Construction, LLC*, 208 Md. App. 29, 56 A.2.3d 303 (2012), provides guidance.

In that case, Campusano and three other plaintiffs sued Lusitano Construction, LLC ("Lusitano"), Geoffrey de Oliveira ("Geoffrey"), and Francisco de Oliveira ("Francisco"), claiming violations of the FLSA as well as the MWPCL.  Following a bench trial, the trial court entered judgment against Lusitano and Geoffrey.  On appeal, plaintiffs/appellants argued, *inter alia*, that Francisco was also an employer within the meaning of the FLSA and the MWPCL.  *Id.* at 33, 56 A.3d at 305.

Writing for the Maryland Court of Special Appeals, Judge Albert Matricciani considered, as a matter of first impression in the context of the MWPCL, whether to apply the "four-factor 'economic reality' test of 'control' developed by federal courts for the FLSA and applied [by the Maryland Court of Appeals] in *Newell*, 407 Md. at 649-54, 967 A.2d [at 771-74] to the Maryland Wage and Hour Law . . . ."  *Campusano*, 208 Md. App. at 36, 56 A.3d at 307.  The *Campusano* Court concluded that the MWPCL is "sufficiently similar" to the Maryland Wage and Hour Law ("MWHL"), L.E. §§ 3-401 *et seq*., "for the economic reality test to apply to the analysis of employer" in MWPCL cases.  208 Md. App. at 38, 56 A.3d at 308.[14]  Notably, the *Campusano*

---

[14]   The MWHL is the State's equivalent to the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq*.  *See Newell*, 407 Md. at 650, 967 A.2d at 771.  Generally, the MWHL governs minimum wages and overtime.  *See* L.E. §§ 3-413, 3-415, 3-420.  In contrast, the MWPCL "sets *specific terms* for payment mandated elsewhere in the Wage and Hour Law."  *Campusano*, 208 Md. App. at 37, 56 A.2.3d at 308 (emphasis in *Campusano*).

Court said, *id.* at 38 n.5, 56 A.3d at 308 n.5:  "We . . . are not bound to define 'employer' according to the common law because the broad definition of 'employ' in LE § 3-101 (as incorporated by Payment and Collection Law § 501(b)), evinces the legislature's intent to expand the common law definition of 'employer' just as it did with the MWHL."  (citing *Newell*, 407 Md. at 649-50, 967 A.2d 729).

After reviewing the definition of employer in the MWPCL, as well as the remedial purposes of the MWPCL statute,  the *Campusano* Court said, 208 Md. App. at 38, 56 A.3d at 308:  "[T]he reasoning in *Newell* leads us to conclude that the economic reality test governs the definition of 'employer' in Payment and Collection Law § 501(b)."  However, the *Campusano* Court recognized that there is "more than one incarnation of the 'economic reality' test.[1]"  208 Md. App. at 38-39, 56 A.3d at 309.  Because there was "insufficient evidence that Francisco personally benefitted from appellants' labor . . . .", *id.* at 39, 56 A.3d at 309, the court focused on the four-factor economic reality test for "control" that the Maryland Court of Appeals had applied in *Newell* in the context of the MWHL.

In *Newell*, 407 Md. at 651, 967 A.2d at 772, the court identified a four-factor test "for formal control" as "the most appropriate" version of the economic reality test.  The pertinent considerations are "'whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'"  *Id.* (quoting *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 142 (2nd Cir. 2008)).  But, the *Campusano* Court cautioned that the factors of control "are not to be applied mechanistically, and their general purpose must be understood as ultimately assigning *responsibility* under the law."  208 Md. App. at 40, 56 A.3d at 310 (emphasis in *Campusano*).  As

stated by Judge Chuang of this Court: "None of these factors is dispositive on its own . . . and 'courts look at the totality of the circumstances' instead of "applying these factors 'mechanically' . . . ." *Hardison v. Healthcare Training Sols., LLC*, PWG-15-3287, 2017 WL 2276840, at *2 (D. Md. May 25, 2017); *see also Speert v. Proficio Mortg. Ventures, LLC*, JKB-10-713, 2011 WL 2417133, at *3 (D. Md. Jun. 11, 2011).

The *Campusano* Court was also guided by First Circuit's decision in *Baystate Alternative Staffing v. Herman*, 163 F.3d 668 (1st Cir. 1998), a FLSA case. *See* 208 Md. App. at 40, 56 A.3d at 310.   In *Baystate*, 163 F.3d at 678, the First Circuit identified "relevant indicia" of control, such as "an individual's operational control over significant aspects of the business and an individual's ownership interest in the business . . . ."   It said, *id.*: "Such indicia, while not dispositive, are important to the analysis, because they suggest that an individual controls the corporation's financial affairs and can cause the corporation to compensate (or not to compensate) employees in accordance with the FLSA."   *Id.*

Notably, in the context of FLSA and individual defendants, the *Baystate* Court observed that "the language of [FLSA] does not support the proposition that officers of a corporation can never be held personally liable for unpaid wages, and . . . that Congress intended the FLSA's reach to transcend traditional common law parameters of the employer-employee relationship." *Id.* at 677 (citing *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983)); *cf. Kerr*, 824 F.3d at 83 ("Employers include those with managerial responsibilities and 'substantial control of the terms and conditions of the work of . . . employees.'") (alterations in *Kerr*) (citation omitted).

In determining personal liability, a court must look to the "economic reality" of the situation, rather than to "technical" common law concepts."   *Id.* (citing *Agnew*, 712 F.2d at 1514).   In this regard, the *Baystate* Court noted the relevance of "the significant ownership

interest of the corporate officers; their operational control of significant aspects of the corporation's day to day functions, including compensation of employees[]; and the fact that they personally made decisions to continue operating the business despite financial adversity and the company's inability to fulfill its statutory obligations to its employees." *Baystate*, 163 F.3d at 677-78.

Maryland continues to adhere to the decision in *Campusano*. The case of *Pinsky v. Pikesville Recreation Council, Inc.*, 214 Md. App. 550, 588, 78 A.3d 471, 493 (2013), was decided by the Maryland Court of Special Appeals about a year after *Campusano*. There, the Court reiterated the applicability of the economic reality test to determine whether a person or entity is an employer under the MWPCL.

Moreover, several other judges of this Court have applied the economic reality test in the context of claims under the MWPCL. *See, e.g.*, *Hardison*, PWG-15-3287, 2017 WL 2276840, at *3 ("[T]he economic reality test applies to the MWPCL also."); *Avila v. Caring Hearts & Hands Assisted Living & Elder Care, LLC*, TDC-15-3943, 2016 WL 4083365, at *4 (D. Md. Aug. 1, 2016) ("[T]he MWPCL contains a definition of 'employer' sufficiently similar to apply the same economic reality test."); *Diaz v. Corp. Cleaning Sols., LLC*, DKC 15-2203, 2016 WL 1321419, at *3 (D. Md. Apr. 5, 2016); *Rollins v. Rollins Trucking, LLC*, JKB-15-3312, 2016 WL 81510, at *2 (D. Md. Jan. 7, 2016). The reasoning of these cases makes clear that in Maryland wage payment cases, the term "employer" is a broad concept, whose meaning is not restricted by traditional corporate protections. Looking to the totality of circumstances, "the analysis turns on the economic realities of the individual's relationship with the putative employee." *Iraheta v. Lam Yuen, LLC*, DKC-12-1426, 2012 WL 5995689, at *3 (D. Md. Nov. 29, 2012).

In his Cross Motion, Macsherry contends that there is no dispute of material fact that Roberts was his "employer" under the MWPCL. ECF 64-1 at 36-41. In Macsherry's view, the evidence demonstrates that each of the four factors considered by Maryland courts points to the conclusion that Roberts was an employer. *Id.* at 38-41.

Defendants dispute that Roberts was Macsherry's employer under the economic reality test. ECF 67 at 28-34. In particular, defendants contend that there is a dispute of material fact as to whether Roberts supervised plaintiff and controlled his work schedule or conditions of employment. In support of their argument, defendants point out that Macsherry testified that Schoelch and John Fronke were Macsherry's supervisors. ECF 67 at 31.[15] Moreover, defendants observe that Macsherry stated that that his expense reimbursements were approved by Schoelch and by Fronke. *Id.* And, defendants assert, *id.* at 32: "[I]t is undisputed that Mike Roberts had little to no contact with Macsherry on a regular basis, did not set his hours or work schedule, and did not control the manner in which Macsherry performed his various duties." Furthermore, defendants argue that Roberts did not determine the rate and method of Macsherry's payment. Defendants point out that both Lydon and Macsherry testified that it was Lydon who managed the payroll. *Id.* Moreover, defendants note that Macsherry testified that it was SPLLC, and not Roberts, who paid Macsherry's salary. *Id.* at 33.

Defendants also contend that a dispute of material fact exists as to whether Roberts maintained plaintiff's employment records. They point out that Lydon testified that it was Lydon, not Roberts, who made decisions with respect to employment records. *Id.* at 33-34.

---

[15] Schoelch left CDC and SPLLC at some point during Macsherry's employment with CDC and/or SPLLC. ECF 67-2 at 205. After Schoelch left the position, Fronke became Machsherry's supervisor. ECF 67-2 at 207.

And, defendants note that Macsherry ultimately went to Lydon, not Roberts, when he was seeking the executed copy of his alleged employment agreement. *Id.* at 34.

Macsherry insists that Roberts "was responsible for withholding Plaintiff's commission, should a jury decide Plaintiff was due one under his Contract." ECF 70 at 3. Macsherry points out that Roberts testified that he told Macsherry that there was no commission owed to him. *Id.* at 2 (quoting ECF 70-1 (Roberts Deposition) at 221). Moreover, Macsherry observes that Roberts stated at his deposition that he (Roberts) was the primary decision maker as to the Property. *Id.* (citing ECF 59-3, ¶¶ 10-16). In addition, Macsherry notes that Roberts "exercised control over even minute aspects of Plaintiff's employment activities, including whether he joined a professional organization at the company's expense . . . or whether  other minor business expenses, such as mileage, breakfasts, and lunches, were approved." ECF 70 at 4. And, Macsherry contends that the evidence shows that Roberts was ultimately responsible for the decisions that were made at the Property. Macsherry notes that Schoelch testified that he did not make decisions without Roberts or T. Roberts "if it was for more than a couple thousand bucks . . . ." *Id.* at 6-7 (citing ECF 70-2 (Schoelch Deposition) at 81).

To be sure, there is ample evidence in support of plaintiff's contention. But, in my view, summary judgment is not appropriate because, viewing the facts in the light most favorable to Roberts, I cannot conclude that Roberts supervised and controlled Macsherry's employment.

As indicated, the second *Newell* factor asks the Court to determine who supervised and controlled employee work schedules and conditions of employment. The undisputed facts demonstrate that Macsherry understood his direct supervisors to be Schoelch and then John Fronke or Jostes. *See* ECF 67-2 (Macsherry Deposition) at 205-207. Also, there is no dispute that Roberts delegated some day-to-day operations to CDC and SPLLC employees, including

Lydon and Schoelch.  *See, e.g.*, ECF 67-4 (Roberts Deposition) at 65-66; 72-76.  For example, Macsherry testified that he submitted expense reports to Schoelch and later to Fronke.  ECF 67-2 at 277-278.

It may be true, as Macsherry argues, that Roberts oversaw portions of the work on the Sparrows Point project.  Perhaps the strongest argument that Macsherry presents is that Roberts approved Macsherry's expenses, the professional organizations that Macsherry was permitted to join at company expense, and the events Macsherry could attend at company expense.  ECF 70-1 at 231-33, 237-38.  Although this evidence tends to show that Roberts had involvement with Macsherry's expenses, it does not unequivocally show a high level of control of Macsherry's day-to-day duties and operations.  This is especially true given that it appears that much of Roberts's involvement with Macsherry's expenses was in reviewing Schoelch's recommendations.  *See id.* at 237-38.

To the extent that Macsherry points to Schoelch's lack of decision-making authority at the Property, this evidence is not substantially probative of the relationship between Roberts and Macsherry.  As noted, Schoelch was asked at his deposition what kind of decisions he was permitted to make on his own.  Schoelch responded, ECF 70-2 at 81: "Repairs.  Responding to tenants.  Emergency situations.  I would, I would not go to [Roberts and T. Roberts] every day, but if it was more than a couple thousand bucks, yes."  From this testimony, it is apparent that Roberts exerted control over decisions made by Macsherry's supervisor regarding the Property.  But, the degree to which Roberts's control extended to Macsherry is not evident.

As indicated, the key purpose of the economic reality test is to determine whether the employer had the right to "control and direct the employee in the performance of the work and in the manner in which the work is to be done.'"  *Mohiuddin*, *supra*, 196 Md. App. at 446, 9 A.3d

at 863-64 (citations omitted).   Viewing the facts in the light most favorable to Roberts, Macsherry has not presented sufficient undisputed evidence demonstrating that Roberts had the right to control and direct Macsherry's work.   Accordingly, I shall deny summary judgment.

## V.      Conclusion

As demonstrated by the foregoing, this case is riddled with significant factual disputes. Therefore,  I shall DENY defendants' motion for summary judgment (ECF 59) and Macsherry's motion for partial summary judgment (ECF 64) as to the issue concerning Roberts's status as plaintiff's employer.

An Order follows, consistent with this Memorandum Opinion.

Date:   August 3, 2017                                         _____/s/_____
                                                             Ellen Lipton Hollander
                                                             United States District Judge